INDEPENDENT FEDERATION OF FLIGHT ATTEN-
DANTS *v.* ZIPES ET AL.

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR
THE SEVENTH CIRCUIT

No. 88–608.   Argued April 25, 1989—Decided June 22, 1989

*Steven A. Fehr* argued the cause for petitioner. With him on the briefs were *William A. Jolley* and *Janae L. Schaeffer.*

*Aram A. Hartunian* argued the cause for respondents. With him on the brief were *Robert M. Weissbourd* and *Kevin M. Forde.* *

JUSTICE SCALIA delivered the opinion of the Court.

Section 706(k) of the Civil Rights Act of 1964, 42 U. S. C. § 2000e–5(k), provides in relevant part that a "court, in its discretion, may allow the prevailing party, other than the [Equal Employment Opportunity] Commission or the United States, a reasonable attorney's fee as part of the costs." In this case we must determine under what circumstances § 706(k) permits a court to award attorney's fees against intervenors who have not been found to have violated the Civil Rights Act or any other federal law.

I

This controversy began in 1970 when respondents, female flight attendants of Trans World Airlines, brought this class action against TWA claiming that its policy of terminating flight attendants who became mothers constituted sex discrimination that violated Title VII of the Civil Rights Act of 1964, 42 U. S. C. § 2000e *et seq.* Respondents were represented by petitioner's predecessor union, the Air Line Stew-

*Briefs of *amici curiae* urging reversal were filed for the United States et al. by *Acting Solicitor General Bryson, Acting Assistant Attorney General Turner, Deputy Solicitor General Merrill, Deputy Assistant Attorney General Clegg, Dennis J. Dimsey,* and *Charles A. Shanor;* for the Americans United for Life Legal Defense Fund by *Edward R. Grant* and *Clarke D. Forsythe;* and for the International Association of Fire Fighters, AFL–CIO, by *Thomas A. Woodley* and *Michael S. Wolly.*

*Colleen K. Connell, Harvey Grossman, John A. Powell,* and *Steven R. Shapiro* filed a brief for the American Civil Liberties Union et al. as *amici curiae.*

ards and Stewardesses Association (ALSSA). Soon after the suit was filed, TWA abandoned the challenged policy and entered into a settlement agreement with ALSSA. This agreement was approved by the District Court, but class members dissatisfied with certain of its terms appealed. Discerning a potential conflict between ALSSA's obligations to respondents and its obligations to incumbent flight attendants, the Court of Appeals reversed the District Court's judgment and ordered that ALSSA be replaced as the representative of respondents' class. *Air Line Stewards and Stewardesses Assn., Local 550, TWU, AFL–CIO* v. *American Air Lines, Inc.*, 490 F. 2d 636, 643 (CA7 1973). On remand the District Court granted summary judgment to respondents on the merits. The Court of Appeals affirmed the District Court's determination that TWA's policy violated Title VII. *In re Consolidated Pretrial Proceedings in Airline Cases*, 582 F. 2d 1142, 1144 (CA7 1978). However, holding that the timely filing of charges with the Equal Employment Opportunity Commission (EEOC) is a jurisdictional prerequisite to suit in federal court, the court went on to find that over 90% of the respondents' claims were on that ground jurisdictionally barred. *Id.*, at 1149–1150. Both parties filed petitions for certiorari; at their request we deferred consideration of the petitions pending the outcome of ongoing settlement negotiations. *Sub nom. Zipes* v. *Trans World Airlines, Inc.*, 442 U. S. 916 (1979). The parties again reached a settlement, in which TWA agreed to establish a $3 million fund to benefit all class members and to credit class members with full company and union "competitive" seniority from the date of termination.[1]

---

[1] "Competitive status" seniority is used "to allocate entitlements to scarce benefits among competing employees," *Franks* v. *Bowman Transportation Co.*, 424 U. S. 747, 766 (1976), while "benefit" seniority is used "to compute noncompetitive benefits earned under the contract of employment," *ibid.*

At this point petitioner, which had replaced ALSSA as the collective-bargaining agent for TWA's flight attendants, sought permission to intervene in the lawsuit on behalf of incumbent flight attendants not affected by the challenged TWA policy and flight attendants hired since TWA's termination of respondents' employment. Petitioner objected to the proposed settlement on two grounds: first, that the District Court lacked jurisdiction to approve equitable relief for the time-barred respondents (designated by the District Court as "Subclass B"); second, that reinstatement of respondents with full retroactive "competitive" seniority would violate the collective-bargaining agreement between petitioner's members and TWA. The District Court permitted petitioner's intervention but rejected its objections, approving the settlement in all respects. The Court of Appeals affirmed. *Air Line Stewards and Stewardesses Assn., Local 550* v. *Trans World Airlines, Inc.*, 630 F. 2d 1164 (CA7 1980). Petitioner then filed a petition for certiorari, raising essentially the same objections to the settlement agreement that it had pressed in the two lower courts. This Court granted the petition and consolidated it with the earlier petition filed by respondents, consideration of which had been deferred. In *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385, 393 (1982), we agreed with respondents that the timeliness requirement of Title VII, 42 U. S. C. § 2000e-5(c), was not jurisdictional and thus that the District Court had jurisdiction to approve the settlement even as to members of Subclass B. We also rejected petitioner's second challenge to the settlement agreement, concluding that reinstatement of all respondents with full competitive seniority was a remedy authorized by Title VII and appropriate in the circumstances of the case. 455 U. S., at 398–400.

To come, finally, to the aspect of this lengthy litigation giving rise to the issues now before us: Respondents' attorneys petitioned the District Court for an award of attorney's fees against petitioner under § 706(k) of the Civil Rights Act

of 1964, 42 U. S. C. § 2000e–5(k). The District Court held that "[u]nsuccessful Title VII union intervenors are, like unsuccessful Title VII defendants, consistently held responsible for attorneys' fees," *Airline Stewards and Stewardesses Assn., Local 550, TWU, AFL–CIO* v. *Trans World Airlines, Inc.,* 640 F. Supp. 861, 867 (ND Ill. 1986), and thus awarded respondents a total of $180,915.84 in fees against petitioner— in addition to approximately $1.25 million it had earlier awarded against TWA from the settlement fund. A divided panel of the Court of Appeals affirmed. *Zipes* v. *Trans World Airlines, Inc.,* 846 F. 2d 434 (1988). We granted the union's petition for certiorari, 488 U. S. 1029 (1989).

## II

In *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240 (1975), this Court reaffirmed what has come to be known as the "American Rule." Put simply, "[i]n the United States, the prevailing litigant is ordinarily not entitled to collect a reasonable attorneys' fee from the loser." *Id.,* at 247. At issue in this case is one of the congressionally created exceptions to that rule. As part of the Civil Rights Act of 1964, Pub. L. 88–352, Tit. VII, 78 Stat. 253, Congress enacted § 706(k), 42 U. S. C. § 2000e–5(k), which provides that a federal district court "in its discretion, may allow the prevailing party, other than the [EEOC] or the United States, a reasonable attorney's fee." Although the text of the provision does not specify any limits upon the district courts' discretion to allow or disallow fees, in a system of laws discretion is rarely without limits. In the case of § 706(k) and other federal fee-shifting statutes,[2] just as in the case of

---

[2] The language of § 706(k) is substantially the same as § 204(b) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a–3(b), which we interpreted in *Newman* v. *Piggie Park Enterprises, Inc.,* 390 U. S. 400 (1968), and 42 U. S. C. § 1988, which we interpreted in *Hensley* v. *Eckerhart,* 461 U. S. 424 (1983). We have stated in the past that fee-shifting statutes' similar language is "a strong indication" that they are to be interpreted alike. *Northcross* v. *Memphis Bd. of Education,* 412 U. S. 427, 428 (1973). See

discretion regarding appropriate remedies, we have found limits in "the large objectives" of the relevant Act, *Albemarle Paper Co.* v. *Moody*, 422 U. S. 405, 416 (1975), which embrace certain "equitable considerations," *Christiansburg Garment Co.* v. *EEOC*, 434 U. S. 412, 418 (1978). Thus, in *Newman* v. *Piggie Park Enterprises, Inc.*, 390 U. S. 400, 402 (1968), we held that under § 204(b) of the Civil Rights Act of 1964, 42 U. S. C. § 2000a–3(b), a prevailing plaintiff should "ordinarily recover an attorney's fee unless special circumstances would render such an award unjust." We thought this constraint on district court discretion necessary to carry out Congress' intention that individuals injured by racial discrimination act as "'private attorney[s] general,' vindicating a policy that Congress considered of the highest priority." 390 U. S., at 402. See also *Albemarle Paper Co.*, *supra*, at 415 (applying the *Newman* standard to § 706(k)); *Northcross* v. *Memphis Bd. of Education*, 412 U. S. 427, 428 (1973) (applying the *Newman* standard to § 718 of the Emergency School Aid Act, 20 U. S. C. § 1617).

Similarly, in *Christiansburg Garment, supra*, we held that even though the term "prevailing party" in § 706(k) does not distinguish between plaintiffs and defendants, the principle of *Newman* would not be applied to a prevailing defendant. Unlike the Title VII plaintiff, we reasoned, the Title VII defendant is not "'the chosen instrument of Congress,'" 434 U. S., at 418, quoting *Newman, supra*, at 402; and unlike the losing defendant, the losing plaintiff is not "a violator of federal law," 434 U. S., at 418. We also rejected, however, the losing plaintiff's argument that sound exercise of § 706(k) discretion would remand the prevailing defendant to the American Rule, providing attorney's fees only if the plaintiff's suit was brought in bad faith. Such an unequal disposition,

also *Hanrahan* v. *Hampton*, 446 U. S. 754, 758, n. 4 (1980) (noting that § 1988 was patterned on § 204(b) and § 706(k)); *Hensley, supra*, at 433, n. 7 (noting that the standards set forth in the opinion apply to all fee-shifting statutes with "prevailing party" language).

we thought, "giving the private plaintiff substantial incentives to sue, while foreclosing to the defendant the possibility of recovering his expenses in resisting even a groundless action unless he can show that it was brought in bad faith," would so "distort" the "fair adversary process" that Congress could not lightly be assumed to have intended it. *Id.*, at 419. We thus concluded that the prevailing defendant could be awarded fees under § 706(k) against the plaintiff whose suit was brought in good faith, but only "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation," *id.*, at 421.

The dissent contends that construing § 706(k) in such fashion as to allow competing rights and equities to be taken into account "ignore[s] its express language," *post*, at 771, in two ways: first, because "the only party mentioned in § 706(k) is 'the prevailing party,'" and thus, "when a district court decides whether to award fees, it must be guided first and foremost by the interests of the prevailing party," *ibid.* This seems to us something less than an "express language" argument—and also a non sequitur. To say that *only* the prevailing party gets fees is not to say that the prevailing party's interests are always first and foremost in determining *whether* he gets them. In any case, as discussed above, we decided long ago that in some circumstances the interests of the losing party *trump* those of the prevailing party under § 706(k), so that the latter cannot obtain fees. See *Christiansburg Garment, supra.* The second respect in which the dissent contends we ignore the "express language" of the statute is that we fail to give effect to its "hostility to categorical rules for the award of attorney's fees," *post*, at 771, supposedly enshrined in the language that the court "in its discretion, *may* allow" (emphasis added) a reasonable attorney's fee. We have already described how the law in general, and the law applied to § 706(k) in particular, does not interpret a grant of discretion to eliminate *all* "categorical

rules."[3]  In *Newman, supra,* at 402, we held that in absence of special circumstances a district court not merely "may" but *must* award fees to the prevailing plaintiff; and in *Christiansburg Garment, supra,* at 421, we held that unless the plaintiff's action is frivolous a district court *cannot* award fees to the prevailing Title VII defendant.   The prescriptions in those cases are no less "categorical" than the rule we set forth today.

   Proceeding, then, to interpret the statute in light of the competing equities that Congress normally takes into account, we conclude that district courts should similarly award Title VII attorney's fees against losing intervenors only where the intervenors' action was frivolous, unreasonable, or without foundation.   It is of course true that the central purpose of §706(k) is to vindicate the national policy against wrongful discrimination by encouraging victims to make the wrongdoers pay at law—assuring that the incentive to such suits will not be reduced by the prospect of attorney's fees that consume the recovery.   See *Newman, supra,* at 401–402.   Assessing fees against blameless intervenors, however, is not essential to that purpose.   In every lawsuit in which there is a prevailing Title VII plaintiff there will also be a losing defendant who has committed a legal wrong. That defendant will, under *Newman,* be liable for all of the fees expended by the plaintiff in litigating the claim against him, and that liability alone creates a substantial added incentive for victims of Title VII violations to sue.   In the present case, for example, TWA paid over $1.25 million in fees to respondents' attorneys.   Respondents argue that this incentive will be reduced by the potential presence of inter-

---

[3] The dissent, *post,* at 772, n. 1, distorts our holding in *United States* v. *Monsanto, ante,* at 613, by describing it as "conclud[ing] that statutory construction that transforms the word 'may' into the words 'may not' . . . impermissibly frustrates legislative intent."   What we plainly said there was that "may" cannot be transformed into "may not" *in such fashion* as to frustrate the legislative intent.

venors whose claims the plaintiff must litigate without prospect of fee compensation. It is not clear to us that that consequence will follow. Our decision in *Martin* v. *Wilks*, 490 U. S. 755, 762–763 (1989), establishes that a party affected by the decree in a Title VII case need not intervene but may attack the decree collaterally—in which suit the original Title VII plaintiff defending the decree would have no basis for claiming attorney's fees. Thus, even if we held that fees could routinely be recovered against losing intervenors, Title VII plaintiffs would still face the prospect of litigation without compensation for attorney's fees before the fruits of their victory can be secure.

But even if the inability generally to recover fees against intervenors did create some marginal disincentive against Title VII suits, we would still have to weigh that against other considerations, as we did in *Christiansburg Garment*. Foremost among these is the fact that, in contrast to losing Title VII defendants who are held presumptively liable for attorney's fees, losing intervenors like petitioner have not been found to have violated anyone's civil rights. See *Christiansburg Garment*, 434 U. S., at 418. In this case, for example, petitioner became a party to the lawsuit not because it bore any responsibility for the practice alleged to have violated Title VII, but because it sought to protect the bargained-for seniority rights of its employees. Awarding attorney's fees against such an intervenor would further neither the general policy that wrongdoers make whole those whom they have injured nor Title VII's aim of deterring employers from engaging in discriminatory practices.

Our cases have emphasized the crucial connection between liability for violation of federal law and liability for attorney's fees under federal fee-shifting statutes. In *Kentucky* v. *Graham*, 473 U. S. 159 (1985), the plaintiffs had brought suit under 42 U. S. C. § 1983 against police officers in their individual capacities, alleging that the officers had violated their constitutional rights. After settling with the officers,

they sought attorney's fees from the officers' employer, the Commonwealth of Kentucky, under 42 U. S. C. § 1988. In rejecting that claim, we stated:

"Section 1988 does not in so many words define the parties who must bear these costs. Nonetheless, it is clear that the logical place to look for recovery of fees is to the losing party—the party legally responsible for relief on the merits. That is the party who must pay the costs of litigation . . . and it is clearly the party who should also bear fee liability under § 1988." 473 U. S., at 164.

See also *id.*, at 165 ("[L]iability on the merits and responsibility for fees go hand in hand"); *id.*, at 168 ("[F]ee liability runs with merits liability"); *ibid.* ("Section 1988 simply does not create fee liability where merits liability is nonexistent"); *id.*, at 171 ("[F]ee and merits liability run together"). Cf. *Supreme Court of Virginia* v. *Consumers Union of United States, Inc.*, 446 U. S. 719, 738 (1980) (holding that § 1988 fees were not recoverable against defendants immune from merits liability). We have also distinguished between wrongdoers and the blameless in the related area of constraints upon district courts' discretion to fashion Title VII remedies. See, *e. g.*, *Ford Motor Co.* v. *EEOC*, 458 U. S. 219, 239–240 (1982); *General Building Contractors Assn., Inc.* v. *Pennsylvania*, 458 U. S. 375, 399–400 (1982).

While innocent intervenors raising non-Title VII claims are not, like Title VII plaintiffs, "the chosen instrument[s] of Congress," *Christiansburg Garment, supra,* at 418, neither are they disfavored participants in Title VII proceedings.[4]

---

[4] The dissent repeatedly implies that intervenors are no more than intermeddlers who get in the way of tidy settlement agreements between Title VII plaintiffs and wrongdoers. See *post,* at 770, 774, 775, 777, 778, 779. That characterization might be understandable if our opinion addressed intervenors who are not themselves affected by the outcome of the lawsuit; but it does not. See *infra,* at 765. What is at issue here is only the liability of intervenors who enter lawsuits to defend their own constitutional or statutory rights. It seems to us that the dissent dismisses out of

An intervenor of the sort before us here is particularly welcome, since we have stressed the necessity of protecting, in Title VII litigation, "the legitimate expectations of . . . employees innocent of any wrongdoing," *Teamsters* v. *United States*, 431 U. S. 324, 372 (1977). Even less with regard to an innocent intervenor than with regard to an allegedly lawbreaking defendant would Congress have wished to "distort" the adversary process, see *Christiansburg Garment, supra*, at 419, by giving the plaintiff a disproportionate advantage with regard to fee entitlement. Moreover, establishing such one-way fee liability against intervenors would foster piecemeal litigation of complex civil rights controversies — a result that is strongly disfavored. See *Martin* v. *Wilks, supra*, at 768. Adopting the regime proposed by respondents — that those who intervene in a Title VII suit are presumptively *liable* for fees, while those who take the alternative course of becoming plaintiffs in independent lawsuits attacking provisions of the decree are presumptively *shielded* from liability — would encourage interested parties to await the entry of judgment and collaterally attack remedial schemes. This

---

hand the legitimate claims of these people, not because they are intermeddlers, but rather because the dissenters have established a judge-made ranking of rights, authorizing Title VII claims to prevail over all others. That is the essential difference between us. Whereas we think that the fee-award provision is subject to "the competing equities that Congress normally takes into account," *supra*, at 761, the dissent believes that we "must be guided first and foremost by the interests of the prevailing party" (so long as that is the Title VII plaintiff and not the defendant, see *Christiansburg Garment Co.* v. *EEOC*, 434 U. S. 412 (1978)), *post*, at 771, and that the only criterion of our decision is that it "respect the objectives of Title VII," *post*, at 772. Those objectives must of course be respected. But nothing in the statute gives them hegemony over all the other rights and equities that exist in the world. Here as elsewhere, the judicial role is to reconcile competing rights that Congress has established and competing interests that it normally takes into account. See, *e. g., Ford Motor Co.* v. *EEOC*, 458 U. S. 219, 239–240 (1982). When Congress wishes Title VII rights to sweep away all others it will say so.

would serve the interests of no one: not plaintiffs, not defendants, not intervenors.

Intervention that is in good faith is by definition not a means of prolonging litigation, but rather of protecting legal rights—ranging from contract-based rights, see, *e. g.*, *Richardson* v. *Alaska Airlines, Inc.*, 750 F. 2d 763 (CA9 1984) (collective-bargaining agreement), to statutory rights, see, *e. g.*, *Prate* v. *Freedman*, 583 F. 2d 42 (CA2 1978) (Title VII), to constitutional rights, see, *e. g.*, *Reeves* v. *Harrell*, 791 F. 2d 1481 (CA11 1986) (Equal Protection Clause); *Grano* v. *Barry*, 251 U. S. App. D. C. 289, 783 F. 2d 1104 (1986) (Takings Clause)—which are entitled to no less respect than the rights asserted by plaintiffs in the subject suit.   In this case petitioner intervened to assert the collectively bargained contract rights of its incumbent employees, rights that neither respondents nor TWA had any interest in protecting in their settlement agreement.   Just this Term we recognized that competitive seniority rights—the specific interests asserted by petitioner—are among the most important ingredients in flight attendants' collective-bargaining agreements.   See *Trans World Airlines, Inc.* v. *Flight Attendants*, 489 U. S. 426, 428–430 (1989).   While a labor union's good-faith advocacy of its members' vital interests was not the specific type of conduct § 706(k) was intended to encourage, it is certainly not conduct that the statute aimed to deter.

Of course, an intervenor may sometimes raise an argument that brings into question not merely the appropriateness of the remedy but the plaintiff's very entitlement to relief. Here, for example, petitioner advanced one argument that would have prevented the District Court's approval of any relief for Subclass B respondents.   But that an intervenor can advance the same argument as a defendant does not mean that the two must be treated alike for purposes of fee assessments.   The central fact remains that petitioner litigated (and lost) not to avoid liability for violation of the law

but to prevent TWA's bargaining away of its members' seniority rights in order to settle with respondents. It was entitled, like any litigant, to pursue that legitimate end through arguments that go to the merits no less than through arguments that go only to the scope of the relief. It would hardly serve the congressional policy in favor of "vigorous" adversary proceedings, *Christiansburg Garment*, 434 U. S., at 419, to require intervenors to disguise or avoid their strongest arguments in order to escape liability for attorney's fees. Moreover, it is often quite difficult to separate arguments directed to the appropriate remedy from arguments directed to the existence or extent of past violations, so that making fees turn upon that distinction would violate our admonition that "a request for attorney's fees should not result in a second major litigation." *Hensley* v. *Eckerhart*, 461 U. S. 424, 437 (1983).

\* \* \*

Because the courts below incorrectly presumed that petitioner was liable for attorney's fees to respondents, and accordingly made no inquiry as to whether petitioner's intervention was frivolous, unreasonable, or without foundation, the judgment of the Court of Appeals is reversed, and the case is remanded for further proceedings consistent with this opinion.

*It is so ordered.*

JUSTICE STEVENS took no part in the consideration or decision of this case.

JUSTICE BLACKMUN, concurring in the judgment.

For me, the Court's approach to the difficult problem of an intervenor's fee liability is not fully satisfying. The Court notes that an intervenor is not like a culpable Title VII defendant because it is not a wrongdoer, and holds that, as a result, the rule that a defendant is presumptively liable for fees if the Title VII plaintiff prevails cannot be applied to an intervenor. The Court also acknowledges that "innocent in-

tervenors raising non-Title VII claims" are not like Title VII plaintiffs, because they are not "'the chosen instrument[s] of Congress'" for enforcing the antidiscrimination policies of Title VII. *Ante*, at 763, quoting *Christiansburg Garment Co.* v. *EEOC*, 434 U. S. 412, 418 (1978). I agree with each of these observations.

Despite the fact, however, that, from Congress' point of view, an intervenor is not like a Title VII plaintiff, the Court today fashions a fee-shifting rule that essentially ignores this difference. The result is presumptively to place the additional cost of litigating third-party rights on the prevailing Title VII plaintiff, whom Congress has assumed lacks the resources to bear them.

This result is neither fair nor necessary. It seems to me that the first step toward solving the problem of intervenor fee liability is to recognize that it is the Title VII wrongdoer, and not the Title VII plaintiff, whose conduct has made it necessary to unsettle the expectations of a third party who itself is not responsible for the Title VII plaintiff's injuries. The Court states that the "defendant will, under *Newman*, be liable for all of the fees expended by the plaintiff in litigating the claim *against him*," *ante*, at 761 (emphasis added)— and thereby tacitly assumes that the defendant's fee liability goes no further. I see no basis for that assumption. Addressing and adjusting the rights of a third party are parts of the social cost of remedying a Title VII violation. That cost, as well as the cost to the plaintiff of vindicating his or her own rights, would not have existed but for the conduct of the Title VII defendant. I see nothing in the language of the statute or in our precedents to foreclose a prevailing plaintiff from turning to the Title VII defendant for reimbursement of all the costs of obtaining a remedy, including the costs of assuring that third-party interests are dealt with fairly.

Thus, where an intervenor enters the case to defend third-party interests and the plaintiff prevails, the costs of the intervention, in my view, should presumptively be borne by

the *defendant*. Such a rule would safeguard the plaintiff's incentive to enforce Title VII by assuring that the costs of defending against an unsuccessful intervention will be recouped, and would give a plaintiff added incentive to invite intervention by interested third parties, whose concerns can be addressed most fairly and efficiently in the original Title VII proceeding. Cf. *Martin* v. *Wilks*, 490 U. S. 755 (1989).

This is not to say that an intervenor may never be held liable for fees. The Court in *Christiansburg* held that § 706(k) of Title VII must be interpreted as a full-scale departure from the American Rule, in order to assure that no party to a Title VII case has an incentive to maintain a position that is taken in good faith but is nonetheless "groundless." 434 U. S., at 419. That rule should apply to an intervenor, as well as to a plaintiff. But the adjustment that should take place is one between the Title VII defendant, whose conduct implicated third-party interests, and the intervenor who seeks to protect those interests. In my view, liability for fees should shift from the defendant to the intervenor if the intervenor's position was "frivolous, unreasonable, or without foundation." *Id.*, at 421. There is no reason why the defendant should be made to pay the cost of frivolous assertions of third-party rights, or that an intervenor should be without incentive to exercise some self-restraint in the position it takes in a Title VII case.

The only potential "disadvantage" to the rule I would adopt is that it would diminish, to some extent, the gains a Title VII defendant could reap from settlement: under my rule, the defendant's fee liability would not cease with its decision to settle the case. The result will not be to deter *all* settlements, however: it will deter only those that unfairly impose disproportionate costs on third parties.

An examination of the considerations that enter into a settlement decision explains why this is so. As a general rule, a defendant framing a settlement offer considers his remedial

exposure in the event the plaintiff prevails at trial, and discounts it by the likelihood that the plaintiff will not prevail. For those aspects of the settlement package that come at the *employer's* expense—*e. g.*, backpay—the employer's settlement offer likely will reflect these considerations. But the Title VII defendant has little incentive to make a similar calculation for elements of the settlement package that burden only third parties—*e. g.*, competitive seniority. Indeed, a defendant has every reason to impose a disproportionate share of the remedial costs of settling a case on third parties, whose interests are not represented in the settlement negotiations. For this reason, a settlement that reasonably serves the employer's needs might well fall short of reasonableness from the point of view of a rational third party.

Under the rule I would adopt, a district court would be permitted to consider the settlement agreement's fairness to third parties as a factor in determining whether the intervenor's opposition to the settlement was reasonable. The intervenor therefore would have the incentive to acquiesce in a settlement proposal that fairly assesses the likely result at trial, because intervention to oppose a settlement which is fair across the board will expose the intervenor to fee liability. And the defendant would have the incentive to consider third-party interests in its settlement proposal, lest it be assessed attorney's fees when third parties reasonably intervene to object to a settlement that is unfair from their point of view. This would be a desirable result, not a reason to reject the fee-shifting rule I propose.

Accordingly, I concur in the judgment of the Court to reverse the judgment of the Court of Appeals and to remand the case for further proceedings. But I do not join the Court's opinion insofar as it requires a prevailing plaintiff to bear the cost of intervention-related attorney's fees unless the intervenor's position is found to be "frivolous, unreasonable, or without foundation." That result needlessly burdens the Title VII plaintiff with litigation costs imposed on

the plaintiff by the unlawful conduct of the Title VII defendant, and compromises Congress' interest in furthering private enforcement of Title VII.

On remand of this case, the court, if it followed my view, first would determine whether the union's position in opposition to the settlement was frivolous or unreasonable. If the court so concluded, the union would be liable for fees. But if the court concluded that the union's position had sufficient merit to bar the assessment of fees against it, the court would go on to consider whether, in the posture of the case, the plaintiffs may recover their attorney's fees from TWA. In particular, the court would determine whether the plaintiffs have preserved a claim for additional fees against TWA and, if so, whether the provisions of the settlement agreement that governs TWA's fee liability foreclose any additional fee award. If the claim has been preserved and additional fees may be recovered from TWA consistent with the settlement agreement, the plaintiffs would be entitled to recover from TWA the attorney's fees due to the intervention.

JUSTICE MARSHALL, with whom JUSTICE BRENNAN joins, dissenting.

Nearly two decades ago, female flight attendants of Trans World Airlines (TWA) brought a class action challenging the airline's practice of terminating all female flight attendants who became mothers, while retaining their male counterparts who became fathers. After almost 10 years of litigation, the parties reached a comprehensive settlement. At this point, petitioner Independent Federation of Flight Attendants (IFFA) intervened to oppose the settlement on two grounds: first, that untimely filing of charges by certain plaintiffs deprived the District Court of jurisdiction to approve their claims for equitable relief; and second, that reinstatement of the plaintiffs with full retroactive "competitive" seniority would violate the collective-bargaining agreement between TWA and IFFA's incumbent members. The plaintiffs spent nearly three years and $200,000 successfully de-

fending the settlement against the intervenor's claims in the District Court, the Court of Appeals for the Seventh Circuit, and this Court. See *Zipes* v. *Trans World Airlines, Inc.*, 455 U. S. 385, 398–399 (1982). Despite the fact that the plaintiffs prevailed against IFFA, and that IFFA was solely responsible for forcing them to invest additional time and money to defend the agreement and thereby vindicate their civil rights, the majority holds that the District Court had practically no discretion under § 706(k) of the Civil Rights Act of 1964 (Act), 42 U. S. C. § 2000e–5(k), to award the plaintiffs attorney's fees from IFFA. Because this result ignores both the language of § 706(k) and the objectives of Title VII of the Act, I dissent.

The majority begins its opinion by quoting § 706(k), but then proceeds to ignore its express language. Section 706(k) states that a "court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee." While § 706(k) provides no detailed rules as to when attorney's fees should be awarded, its terms nonetheless make two things clear. First, the only party mentioned in § 706(k) is "the prevailing party." Thus, when a district court decides whether to award fees, it must be guided first and foremost by the interests of the prevailing party. See *Texas State Teachers Assn.* v. *Garland Independent School Dist.*, 489 U. S. 782, 790 (1989) ("Congress clearly contemplated that . . . fee awards would be available where a party has prevailed on an important matter in the course of the litigation . . .") (internal quotations omitted); *Charles* v. *Daley*, 846 F. 2d 1057, 1064 (CA7 1988) (civil rights fee-shifting statutes "fashion the parameters of *eligibility* for fee awards, rather than . . . fix with precision the bounds of *liability* for such awards") (emphasis in original). Second, § 706(k) contains "permissive and discretionary language," *Christiansburg Garment Co.* v. *EEOC*, 434 U. S. 412, 418 (1978), reflecting Congress' hostility to categorical rules for the award of attorney's fees.

The majority overlooks both of these textual directives. After *Zipes* v. *Trans World Airlines, supra,* there can be little doubt that the plaintiffs prevailed in the face of IFFA's challenges to the settlement agreement. Disregarding § 706(k)'s focus on the success of the plaintiffs, however, the majority decrees that the propriety of a fee award turns instead on the motivations and claims of the losing party, in this case an intervenor. To make matters worse, the majority also ignores Congress' explicit conferral of discretion on the district courts, and instead establishes an absolute rule that, in all circumstances, a court must treat an intervenor like a plaintiff for fee liability purposes.[1] Section 706(k), of course, does not invest district courts with unfettered discretion to award attorney's fees to prevailing parties. But this does not mean that this Court has a free hand to fashion limitations. Rather, the principles we articulate to guide a district court's discretion in awarding attorney's fees in civil rights cases should respect the objectives of Title VII. See *Albemarle Paper Co.* v. *Moody,* 422 U. S. 405, 416–417 (1975). Regrettably, the limitations formulated by the majority do nothing of the kind.

The Civil Rights Act of 1964 embodies a national commitment to eradicate discrimination. Congress intended not only "to make the wrongdoers pay at law," *ante,* at 761, but more broadly to make victims of discrimination whole. See *Albemarle Paper Co., supra,* at 418. Given the scarcity of public resources available for enforcement, individuals injured by discrimination serve as "the chosen instrument of Congress to vindicate 'a policy that Congress considered of the highest priority.'" *Christiansburg Garment, supra,* at 418, quoting *Newman* v. *Piggie Park Enterprises, Inc.,* 390

---

[1] Just today, in *United States* v. *Monsanto, ante,* at 613, the Court concluded that statutory construction that transforms the word "may" into the words "may not," thereby substituting a command for congressionally mandated discretion, impermissibly frustrates legislative intent. I see no reason to depart from this commonsense rule in the civil rights context.

U. S. 400, 402 (1968).   Congress recognized that victims of discrimination often lack the resources to retain paid counsel, and frequently are unable to attract lawyers on a contingency basis because many victims seek injunctive relief rather than pecuniary damages.   See, *e. g.*, S. Rep. No. 94–1011, pp. 1–4 (1976); H. R. Rep. No. 94–1558, pp. 1–3 (1976); Note, Promoting the Vindication of Civil Rights Through the Attorney's Fees Awards Act, 80 Colum. L. Rev. 346, 350–351 (1980).   It therefore enacted § 706(k) to ensure that victims of discrimination could obtain lawyers to bring suits necessary to vindicate their rights and to provide victorious plaintiffs with fully compensatory attorney's fees.   *Newman, supra,* at 402.   Nothing in the legislative history indicates that Congress intended to limit the types of losing parties against whom attorney's fees could be awarded.   Indeed, given Congress' broad remedial goals, the majority errs in casually presuming that such limits exist.[2]

---

[2] Congress fully expected fee awards under civil rights fee-shifting statutes to turn on whether the party seeking civil rights relief prevailed and not on formal labels such as plaintiff, defendant, or intervenor.   For example, when Congress adopted 42 U. S. C. § 1988 in response to *Alyeska Pipeline Service Co.* v. *Wilderness Society,* 421 U. S. 240 (1975), the Senate Committee on the Judiciary noted: "In the large majority of cases the party or parties seeking to enforce [civil] rights will be the plaintiffs and/or plaintiff-intervenors.   However, in the procedural posture of some cases, the parties seeking to enforce such rights may be the defendants and/or defendant-intervenors."   S. Rep. No. 94–1011, p. 4, n. 4 (1976).   The same Committee cited approvingly a pre-*Alyeska* decision in which the prevailing party was awarded attorney's fees against intervenors.   See *id.,* at 4, n. 3, citing *Sims* v. *Amos,* 340 F. Supp. 691 (MD Ala.) *(per curiam)* (three-judge court), aff'd, 409 U. S. 942 (1972) (affirming fee award against state legislators who intervened to defend legislative apportionment scheme).   *Alyeska* itself, which barred an attorney's fees award against an intervenor in an action brought pursuant to the Mineral Lands Leasing Act of 1920, 30 U. S. C. § 185, did not reverse the fee award because the losing party was an intervenor, but only because there was no statute, such as § 706(k), authorizing an exception to the American Rule. See 421 U. S., at 263, 267–268.

The majority's contention that its ruling will not discourage private plaintiffs from bringing civil rights suits, or that it will only "create some marginal disincentive," *ante*, at 762, is hard to take seriously. The costs to plaintiffs are no less real when the person causing the financial expenditures is an intervenor than when he is a defendant. To vindicate their civil rights, many plaintiffs must respond to, and defeat, claims raised by intervenors in support of the challenged practice or in opposition to the proposed remedy. Such intervenors force victims of discrimination to spend additional scarce resources to obtain relief, often long after the named defendant has conceded a violation of the Act. See, *e. g.*, *Geier* v. *Richardson*, 871 F. 2d 1310, 1313 (CA6 1989) (United States, as intervenor, challenged settlement reached after 15 years of litigation); *Akron Center for Reproductive Health* v. *Akron*, 604 F. Supp. 1268, 1272 (ND Ohio 1984) (individuals who intervened solely to defend an abortion ordinance that did not implicate their conduct filed 40 documents, at least 14 of which required independent responses from the plaintiffs); *Vulcan Society of Westchester Co., Inc.* v. *Fire Dept. of White Plains*, 533 F. Supp. 1054, 1062 (SDNY 1982) (union intervened and moved to dissolve a temporary restraining order granted to the plaintiffs). By denying plaintiffs the opportunity to be compensated for those expenditures simply because the losing party was an intervenor rather than a named defendant, the majority breaks the congressional promise that prevailing plaintiffs will be made whole for efforts to vindicate their civil rights. Cf. *Sullivan* v. *Hudson*, 490 U. S. 877 (1989) (right to fee awards for prevailing civil rights plaintiffs extends to work performed in administrative as well as judicial proceedings).[3]

---

[3] While the majority pays lipservice to the objectives of Title VII, it is guilty of establishing its own "judge-made ranking of rights." *Ante*, at 764, n. 4. By elevating intervenors to the same plane as Title VII plaintiffs, the majority undermines Congress' determination that Title VII

The majority further states that a defendant's liability for "all of the fees expended by the plaintiff in litigating the claim *against him*, . . . *alone* creates a substantial added incentive for victims of Title VII violations to sue." *Ante*, at 761 (emphasis added). The majority apparently believes that the typical victim injured by discrimination will have available discretionary income, possibly running into the hundreds of thousands of dollars, to spend to counter intervenors' claims. If the typical victim had access to such financial resources, however, there would have been less need in the first place for civil rights fee-shifting statutes. Or perhaps the Court is assuming that the initial fee award in this case of over $1.25 million is so large that it should cover whatever costs the plaintiffs have incurred, including those costs incurred in responding to the intervenor's claims. But this ignores the fact that the District Court concluded that $1.25 million was a reasonable attorney's fee only for the hours the plaintiffs' attorneys spent reaching the settlement with the defendant. The notion that this award can also compensate the plaintiffs for the expenses of subsequent litigation against the intervenor presumes that the initial fee award was not reasonable, but rather far in excess of the amount warranted.

To justify a result contrary to the language of § 706(k) and the objectives of Title VII, the Court offers two propositions: first, that liability on the merits is a prerequisite for liability for fees; and second, that the interests of intervenors are as important as the civil rights concerns of plaintiffs. Neither assertion withstands scrutiny. Nor does either explain why the majority has adopted a blanket rule that all intervenors must be treated like plaintiffs for purposes of fee liability.

This Court has never held that one is immune from liability for attorney's fees absent a finding of liability on the merits. On the contrary, we have expressly recognized that a district court's authority to award fees in civil rights cases does *not*

plaintiffs alone are "the chosen instruments" for vindicating the national policy against discrimination.

require a finding that any party caused a civil rights injury. See *Maher* v. *Gagne*, 448 U. S. 122, 129 (1980) ("Nothing in the language of § 1988 conditions the District Court's power to award fees on . . . a judicial determination that the plaintiff's rights have been violated").[4] The majority's alternative suggestion stems from a misreading of several of this Court's precedents.

In *Christiansburg Garment*, for example, we held that prevailing defendants could recover fees from civil rights plaintiffs only if the suit was "frivolous, unreasonable, or without foundation." 434 U. S., at 421. We explained that the two "equitable considerations" that warrant an award of attorney's fees when a plaintiff prevails — compensating the party who is the chosen instrument for enforcing civil rights laws, and assessing fees "against a violator of federal law" — are "wholly absent" when a defendant prevails against a plaintiff. *Id.*, at 418. The majority reads *Christiansburg Garment* as mandating that both considerations be satisfied before attorney's fees can be imposed. But our holding that a plaintiff could be assessed attorney's fees in certain circumstances plainly demonstrates that liability on the merits is not always a precondition for liability for fees.[5]

---

[4] By contrast, several fee-shifting statutes outside the civil rights field specify that attorney's fees are available only upon a showing of injury in violation of the underlying statute. See, *e. g.*, Bank Holding Company Act Amendments of 1970, 12 U. S. C. § 1975; Clayton Act, 15 U. S. C. § 15.

[5] Similarly, if liability for attorney's fees is premised on liability on the merits, then it is hard to understand why a court could *ever* impose attorney's fees against an intervenor. Yet, the majority applies the *Christiansburg Garment* rule to intervenors so that a district court may award attorney's fees pursuant to § 706(k) "where the intervenors' action was frivolous, unreasonable, or without foundation." *Ante*, at 761. In permitting fee awards against intervenors under these limited circumstances, the majority thus implicitly recognizes that a district court should be able to impose a fee award solely on the ground that the intervenor's claims did not warrant the added length and cost of the litigation.

*Kentucky* v. *Graham*, 473 U. S. 159 (1985), likewise provides no support for the majority's assertion that civil rights wrongdoers are the only persons liable for fees. The plaintiffs in *Graham* sued employees of the Commonwealth of Kentucky in their personal capacity for civil rights violations, and named the Commonwealth for attorney's fees that might result. Relying on the Eleventh Amendment, the District Court dismissed the Commonwealth as a party. The Commonwealth then refused to defend the individual defendants or to pay for their litigation expenses. Although the plaintiffs ultimately prevailed against the individual defendants, we concluded that § 1988 did not authorize a fee award against the Commonwealth because it "ha[d] not been prevailed against." *Id.*, at 165. We thus refused to impose vicarious liability for attorney's fees on a nonparty who neither actively participated nor intervened in the litigation. That is hardly the situation in this case. The plaintiffs here prevailed against a party who voluntarily intervened in the litigation and who actively opposed the settlement for several years after the defendant had agreed to liability.[6]

Nor does this Court's decision in *Supreme Court of Virginia* v. *Consumers Union of United States, Inc.*, 446 U. S. 719 (1980), support the proposition that liability on the merits

---

[6] The majority asserts that permitting fee assessments against intervenors will cause these parties to refrain from intervening in favor of attacking consent decrees through collateral actions in which the original Title VII plaintiffs will have no basis for claiming attorney's fees. This argument is specious. First, *Martin* v. *Wilks*, 490 U. S. 755 (1989), on which the majority relies, is silent on whether a court may impose attorney's fees against a party challenging a consent decree in a collateral action. The majority's intimation to the contrary is conclusory dicta of the worst kind. Second, notwithstanding the possibility of fee liability, interested parties have strong incentives to intervene in a Title VII action rather than to wait and file a collateral attack. An intervenor may directly challenge the merits of a claim or defense in the underlying action, see 3B J. Moore & J. Kennedy, Moore's Federal Practice ¶ 24.16[4] (2d ed. 1987), and may help craft an appropriate remedy. In so doing, an intervenor avoids the delay and increased costs of a collateral action.

is always a precondition to liability for fees. In *Consumers Union*, we absolved the Supreme Court of Virginia from fee liability because it had been acting in a legislative capacity when it promulgated the challenged regulations, and thus enjoyed common-law absolute legislative immunity. *Id.*, at 738–739. Unlike the Commonwealth of Kentucky and the Supreme Court of Virginia, IFFA enjoys no special immunity warranting exemption from fee liability.[7]

Aside from its unpersuasive assertion that fee liability must be conditioned on a finding of wrongdoing, the majority never even attempts to explain why it adopts a categorical rule directing district courts to treat all intervenors like civil rights plaintiffs. Whatever validity such treatment might have where an intervenor raises a civil rights claim, there is absolutely no justification for it where, as in this case, an intervenor asserts non-civil-rights claims of third parties, or where an intervenor raises no third-party claims at all.[8] The majority's failure to differentiate among intervenors can-

---

[7] Where Congress intends to exclude certain parties from fee entitlement or fee liability, it states so specifically. For example, § 706(k) itself expressly excludes the Federal Government from fee entitlement. See also Fair Labor Standards Act, 29 U. S. C. § 216(b) (authorizing fee liability only for "defendants" who are "employers"); Civil Rights Act of 1968, 42 U. S. C. § 3612(c) (authorizing fee entitlement only for "plaintiffs").

[8] Some parties intervene for the sole purpose of defending the challenged practice or opposing the relief sought by the civil rights plaintiffs. See, *e. g., Diamond v. Charles*, 476 U. S. 54 (1986) (pediatrician intervened to defend an abortion statute that neither implicated nor threatened his conduct); *Akron Center for Reproductive Health v. Akron*, 604 F. Supp. 1268, 1272 (ND Ohio 1984) (same). In most instances, intervenors not asserting the rights of third parties could adequately express their views by proceeding as *amicus curiae*. When they decline this option and instead voluntarily intervene, they benefit from "their ability to affect the course and substance of the litigation," and thus should "fairly be charged with the consequences," including the risk of attorney's fees. *Charles v. Daley*, 846 F. 2d 1057, 1067 (CA7 1988); see also *Akron Center*, *supra*, at 1274.

not be squared with Congress' conferral of discretion on the district courts.

The majority also seeks to justify its interpretation of § 706(k) by asserting the importance of the claims asserted by intervenors. With respect to this case, the majority states that IFFA's contract-based rights "are entitled to no less respect than the rights asserted by plaintiffs in the subject suit." *Ante*, at 765. The issue, however, is not whether the claims are entitled to equal respect, but whether fees are beyond the discretion of the District Court.[9] As the majority concedes, "intervenors raising non-Title VII claims are not, like Title VII plaintiffs, 'the chosen instrument[s] of Congress.'" *Ante*, at 763, quoting *Christiansburg Garment*, 434 U. S., at 418. The central fact then is not, as the Court suggests, "that petitioner litigated . . . to prevent TWA's bargaining away of its members' seniority rights in order to settle with respondents," *ante*, at 765–766, or that IFFA did not violate Title VII, but rather that the plaintiffs who seek fees from IFFA are "the chosen instruments of Congress" to eradicate discrimination. In its rush to protect an intervenor who contributed almost $200,000 in costs and nearly three years to the plaintiffs' struggle to achieve a settlement, the Court leaves behind the plaintiffs themselves, thereby reversing congressional priorities. The critical question in determining whether fees are awarded pursuant to § 706(k) should be whether the plaintiff prevailed, either against a named defendant or an intervenor. If the plaintiff has done so, fees ordinarily should—and certainly may—be awarded.

Finally, the majority ignores the likely consequence of today's decision. In the future, defendants can rely on in-

---

[9] The majority forgets, furthermore, that the Court has already recognized that vindicating the civil rights of victims of discrimination may require an award of retroactive seniority that may adversely affect innocent employees. See, *e. g.*, *Teamsters* v. *United States*, 431 U. S. 324 (1977); *Franks* v. *Bowman Transp. Co.*, 424 U. S. 747 (1976).

tervenors to raise many of their defenses, thereby minimizing the fee exposure of defendants and forcing prevailing plaintiffs to litigate many, if not most, of their claims against parties from whom they have no chance of recovering fees. Without the hope of obtaining compensation for the expenditures caused by intervenors, many victims of discrimination will be forced to forgo remedial litigation for lack of financial resources. As a result, injuries will go unredressed and the national policy against discrimination will go unredeemed. I dissent.