# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

_____

No. 98-1563

_____

|  |  |  |
|---|---|---|
| Andrew Miller and Martin R. Hoer, | * | |
| | * | |
| Appellees, | * | |
| | * | |
| v. | * | |
| | * | |
| Scott Moore, Secretary of State | * | |
| for the State of Nebraska, | * | |
| | * | |
| Appellant, | * | |
| | * | |
| and | * | |
| | * | |
| U.S. Term Limits Foundation, | * | |
| Nebraska Term Limits Coalition, | * | |
| and Robert D. Wright, | * | |
| | * | |
| Intervenor-Defendants . | * | |

_____

No. 98-1566

_____

|  |  |  |
|---|---|---|
| Timothy J. Duggan, Ray L. | * | |
| Lineweber, ACLU Nebraska, | * | Appeals from the United States |
| Ron Withem, and Ernest Chambers, | * | District Court for the District |
| | * | of Nebraska. |
| Appellees, | * | |
| | * | |

v.                                    *
                                      *
Scott Moore, Secretary of State       *
for the State of Nebraska,            *
                                      *
          Appellant,                  *
                                      *
          and                         *
                                      *
U.S. Term Limits Foundation,          *
Nebraska Term Limits Coalition,       *
and Robert D. Wright,                 *
                                      *
          Intervenor-Defendants.      *


                    _____

                    No. 98-1827

                    _____


Timothy J. Duggan, Ray L.             *
Lineweber, ACLU Nebraska,             *
and Ron Withem,                       *
                                      *
          Appellees,                  *
                                      *
v.                                    *
                                      *
Scott Moore, Secretary of State       *
for the State of Nebraska,            *
                                      *
          Defendant,                  *
                                      *
          and                         *
                                      *

U.S. Term Limits Foundation,                    *
                                                *
        Appellant,                              *
                                                *
        and                                     *
                                                *
Nebraska Term Limits Coalition                  *
and Robert D. Wright,                           *
                                                *
        Intervenor-Defendants.                  *

_____

Submitted:  November 18, 1998

Filed:  Tuesday, March 2, 1999
_____

Before BEAM, MAGILL, and MORRIS SHEPPARD ARNOLD, Circuit Judges.
_____

MORRIS SHEPPARD ARNOLD, Circuit Judge.

Nebraska State Senator Ernie Chambers, ACLU Nebraska, Timothy Duggan, Martin Hoer, Ray Lineweber, Andrew Miller, and Ron Withem brought this action under 42 U.S.C. § 1983, seeking declaratory and injunctive relief against Scott Moore, the secretary of state of Nebraska.  (Although this appeal actually involves three separate cases, we treat them as one case for purposes of simplicity.)  The plaintiffs sought to enjoin Mr. Moore from implementing and enforcing Article XVIII of the Nebraska Constitution, an amendment passed by voter initiative in the 1996 general election.

Article XVIII makes it Nebraska's "official position" that its elected officials should work to enact an amendment to the U.S. Constitution limiting congressional service to two terms in the Senate and three terms in the House of Representatives.

The provision then "instructs" each of Nebraska's representatives in Congress to "use all of his or her delegated powers" to pass the specified term limits amendment. It also "instructs" members of the Nebraska legislature to apply to Congress, see U.S. Const. art. V, for a national convention, the purpose of which is to propose a congressional term limits amendment. Nebraska's Article XVIII also includes a detailed list of instructions to legislators with respect to proposing, seconding, and voting in favor of the term limits amendment, and it requires that the label "DISREGARDED VOTERS [sic] INSTRUCTIONS ON TERM LIMITS" be placed on the ballot adjacent to the name of any incumbent candidate who fails to comply with all of those instructions. The Nebraska secretary of state is assigned the task of determining whether an incumbent candidate will receive the pejorative ballot label.

Article XVIII also requires that nonincumbent candidates for Congress or for the Nebraska legislature be given an opportunity to take a "Term Limits Pledge" stating that, if elected, they will use their legislative powers to enact the term limits amendment specified in Article XVIII. Nonincumbent candidates who refuse to take the pledge receive the ballot label "DECLINED TO TAKE PLEDGE TO SUPPORT TERM LIMITS."

The district court granted declaratory and injunctive relief to the plaintiffs, holding that Article XVIII violates both the First Amendment and Article V of the U.S. Constitution. Secretary of State Moore appeals, and we affirm the judgment of the district court with respect to these issues. The district court also assessed attorney's fees against U.S. Term Limits Foundation, which appeals that award. We remand the case for reconsideration with respect to the issue of attorney's fees.

I.

As a preliminary matter, we address the issue of standing. We agree with the district court that Nebraska State Senator Ernie Chambers, as an opponent of a constitutional term limits amendment, has alleged a sufficiently particularized and

concrete injury to give him standing in this case. *See Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The district court found that Article XVIII injures Senator Chambers by threatening him with a pejorative ballot label if he refuses to comply with its mandates, a ballot label that would seriously jeopardize his chances of reelection and threaten his political career and livelihood. The record amply supports the district court's finding, and we think that the threatened harm is sufficient under the relevant cases to confer standing on Senator Chambers to challenge the constitutionality of Article XVIII's provisions pertaining to state legislators. *See, e.g.*, *Meese v. Keene*, 481 U.S. 465, 473 (1987) (state legislator seeking to show films identified as "political propaganda" under Foreign Agents Registration Act had standing to challenge constitutionality of act, where legislator claimed that his exhibition of films with that label would harm his chances for reelection and adversely affect his reputation in the community). *See also Lujan*, 504 U.S. at 561-62 (when suit challenges legality of a governmental action, and plaintiff is object of that action, plaintiff ordinarily has standing).

In support of the argument that Senator Chambers lacks standing, Secretary of State Moore draws our attention to the Supreme Court's recent decision in *Raines v. Byrd*, 117 S. Ct. 2312, 2322 (1997), in which the Court held that members of Congress lacked standing to challenge the Line Item Veto Act. We think, however, that *Raines* is clearly distinguishable from the case before us. In *Raines*, the Court emphasized that the injury alleged by the legislators was merely an "abstract dilution of institutional legislative power," *id.* at 2320-21, that affected all members of Congress equally, rather than a concrete injury to individual legislators who were singled out for "specially unfavorable treatment," *id.* at 2318. Here, however, the district court found, and with reason, that Article XVIII's ballot labeling provisions threaten Senator Chambers's political career and livelihood -- precisely the type of individualized, concrete injury that the Supreme Court found lacking in *Raines*. Accordingly, *Raines* has no application here.

Because Senator Chambers, as an incumbent state legislator, lacks standing to challenge the provisions in Article XVIII pertaining to either incumbent U.S. representatives or nonincumbent candidates, we must decide whether Messrs. Duggan, Hoer, Lineweber, Miller, and Withem, as registered voters, have standing to challenge these provisions. In reviewing ballot regulations such as Article XVIII, "our primary concern is not the interest of [the] candidate ... but rather, the interests of the voters who chose to associate together to express their support for [that] candidacy and the views ... espoused." *Anderson v. Celebrezze*, 460 U.S. 780, 806 (1983). A voter therefore has standing to challenge a state law regulating elections when that law "would restrict his ability to vote for the candidate of his choice or dilute the effect of his vote if his chosen candidate were not fairly presented to the voting public." *McLain v. Meier*, 851 F.2d 1045, 1048 (8th Cir. 1988) (holding that voter had standing to challenge ballot access law that he claimed was overly restrictive in signature requirements and deadlines). In our case, the voters contend that Article XVIII's pejorative ballot labels injure them by greatly diminishing the likelihood that the candidates of their choice will prevail in the election. We agree with the district court's finding that this constitutes a sufficiently concrete and particularized injury to give the plaintiffs standing in the case before us.

Because we find that Messrs. Duggan, Hoer, Lineweber, Miller, and Withem have standing as voters to challenge the constitutionality of Article XVIII in its entirety, we need not decide whether Mr. Lineweber also has standing as a potential future candidate for the state legislature, or whether ACLU Nebraska has standing on behalf of its members. *See Bowsher v. Synar*, 478 U.S. 714, 721 (1986).

II.

The U.S. Constitution provides two exclusive methods for its own amendment:

The Congress, whenever two thirds of both Houses shall deem it necessary, shall propose Amendments to this Constitution, or, on the

Application of the Legislatures of two thirds of the several States, shall call a Convention for proposing Amendments.

U.S. Const. art. V. In the handful of cases discussing Article V's amendment scheme, the Supreme Court has made it clear that both methods of amendment that the framers provided "call for action by deliberative assemblages representative of the people, which it was assumed would voice the will of the people." *Hawke v. Smith*, 253 U.S. 221, 226-27 (1920). As a consequence, the voters in an individual state have, at best, a very limited role in the amendment process. In *Leser v. Garnett*, 258 U.S. 130 (1922), for example, the Supreme Court held that provisions in several state constitutions that forbade the legislatures of those states to adopt a constitutional amendment granting women the right to vote, were in conflict with Article V. The Court explained:

> [T]he function of a state legislature in ratifying a proposed amendment to the Federal Constitution, like the function of Congress in proposing the amendment, is a federal function derived from the Federal Constitution; and it transcends any limitations sought to be imposed by the people of a State.

*Id.* at 137; *see also Hawke*, 253 U.S. at 231 (striking down under Article V a state constitutional provision requiring that ratification of proposed amendments to the U.S. Constitution be submitted to popular referendum).

On the other hand, we believe that a "nonbinding, advisory referendum," *Kimble v. Swackhamer*, 439 U.S. 1385, 1388 (1978), on proposed constitutional amendments does not violate Article V. In *Kimble*, Justice Rehnquist, sitting as Circuit Justice, had before him a Nevada statute that required submission of an "advisory question," *id.* at 1386, to Nevada voters as to whether the state legislature should vote to ratify the Equal Rights Amendment. The statute expressly provided, however, that the result of the popular referendum placed no legal requirement on the

members of the legislature regarding their own votes on the amendment. *Id.* Justice Rehnquist refused to grant interim relief against the referendum, noting that he "would be most disinclined to read either *Hawke* ... or *Leser* ... as ruling out communication between the members of the legislature and their constituents." *Id.* at 1387-88.

The question before us, then, is where Nebraska's Article XVIII falls on the spectrum between impermissible direct involvement of the people in the amendment process (as in *Leser* and *Hawke*) and permissible advisory and nonbinding communication between the people and their representatives (as in *Kimble*). Secretary of State Moore maintains that Article XVIII is merely an advisory statement of popular opinion that legislators are free to ignore, and is thus permissible under *Kimble.* He argues, moreover, that because he and other Nebraska state officials have construed Article XVIII as nonbinding on legislators, we must defer to that interpretation.

We disagree. Unlike the measure in *Kimble*, which specifically stated that legislators were not bound by the results of the referendum, we believe that Nebraska's Article XVIII represents a clear attempt to coerce or bind legislators into exercising their Article V powers to pass a term limits amendment. The language of Article XVIII is mandatory: It does not, for example, "advise" or "suggest" or "urge" Nebraska's legislators to pass a term limits amendment; instead, it "instructs lawmakers to proceed on a precise and inflexible course of action utilizing the full range of their Article V authority," *Morrissey v. Colorado*, 951 P.2d 911, 916 (Colo. 1998) (*en banc*). Article XVIII penalizes legislators who disobey its mandate, moreover, by notifying the voters in the next election that these legislators have "disregarded" the voters' "instructions" on term limits. We do not think that such a provision can plausibly be read as merely advisory.

An examination of the constitutional history behind popular "instructions" to legislators gives us further cause to doubt the constitutionality of Article XVIII. In 1789, the House of Representatives rejected a proposed "right to instruct Representatives" that would have been one of the rights specified in the First Amendment. *See* P. Kurland and R. Lerner, eds., 5 *The Founders' Constitution* 200-06 (1987) (debate on inclusion of proposed "right to instruct Representatives"), and A. Amar, *Philadelphia Revisited: Amending the Constitution Outside Article V*, 55 U. Chi. L. Rev. 1043, 1058-60 (1988). James Madison and his fellow Federalists, in particular, feared that popular instructions to legislators would destroy legislative debate and make compromise impossible. *See* Kurland and Lerner, 5 *The Founders' Constitution*, at 201-02, and Amar, *Philadelphia Revisited*, at 1059. They feared, in addition, that a right to instruct, whether or not legally binding on legislators, would convey to the people the idea that they had a right to control the debates of Congress, thus undermining the Federalists' scheme of representative government. *See* Kurland and Lerner, 5 *The Founders' Constitution*, at 202-04, and Amar, *Philadelphia Revisited*, at 1058-60.

We think that Article XVIII's instructions to legislators do precisely what the members of the House of Representatives were seeking to prevent by rejecting a right of instruction: They undermine representative government by permitting the people to control and direct the Article V powers of Nebraska's legislators in a very specific, detailed manner. The ballot label ("DISREGARDED VOTERS [sic] INSTRUCTIONS ON TERM LIMITS"), moreover, reinforces the erroneous impression among voters that the people in fact have the right to "instruct" and control their legislators in this way.

We therefore conclude that Nebraska's Article XVIII is an unconstitutional attempt effectively to remove the Article V power from legislators and to place it in the hands of the people, thus substituting popular will for the will of the independent "deliberative assemblage," *Hawke*, 253 U.S. at 227, envisioned by the framers of the

Constitution.  Such direct involvement by the people is impermissible under Article V's amendment scheme, and we therefore hold that Sections 2, 4, and 5 of Nebraska's Article XVIII (the provisions pertaining to legislators) are unconstitutional.

## III.

In addition to the conflict with Article V, we think that the ballot labeling provisions of Nebraska's Article XVIII ("DISREGARDED VOTERS [sic] INSTRUCTIONS ON TERM LIMITS" for incumbent candidates, and "DECLINED TO TAKE PLEDGE TO SUPPORT TERM LIMITS" for nonincumbent candidates) are an unconstitutional infringement on the right to vote, a "fundamental political right," *Williams v. Rhodes*, 393 U.S. 23, 38 (1968) (Douglas, J., concurring).  The Supreme Court has made it clear that some state laws governing ballot content and ballot access may unconstitutionally infringe on "the right of qualified voters ... to cast their votes effectively," *Williams*, 393 U.S. at 30, and on a candidate's or political party's right to "continued availability of political opportunity" through reasonable access to the ballot, *Lubin v. Panish*, 415 U.S. 709, 716 (1974).  Thus while states enjoy a wide latitude in regulating elections and in controlling ballot content and ballot access, they must exercise this power in a reasonable, nondiscriminatory, politically neutral fashion.  *See Burdick v. Takushi*, 504 U.S. 428, 434, 438 (1992).

The Supreme Court has addressed the constitutionality of a state's ballot labeling provision on only one occasion.  *See Anderson v. Martin*, 375 U.S. 399, 401-02 (1964) (striking down, on equal protection grounds, Louisiana statute requiring that candidate's race appear next to candidate's name on ballot); *see also McLain v. Meier*, 637 F.2d 1159, 1167 (8th Cir. 1980) (holding that North Dakota statute requiring that incumbent candidates be listed first on ballot burdened right to vote by showing favoritism to voters who supported incumbent and major-party candidates).  We think, however, that the Supreme Court's decisions addressing state laws governing ballot access and other election procedures are equally applicable here.

Those decisions make it clear that a state's legitimate interests in regulating elections are limited to promoting "orderly, fair, and honest elections." *U.S. Term Limits v. Thornton*, 514 U.S. 779, 834 (1995). In *U.S. Term Limits*, the Supreme Court reviewed its case law on the states' power to regulate elections, and concluded: "States are thus entitled to adopt 'generally applicable and evenhanded restrictions that protect the integrity and reliability of the electoral process itself.' " *Id.* at 834, quoting *Anderson*, 460 U.S. at 788 n.9. State laws are permissible, therefore, when they "regulate election procedures and [do] not even arguably impose any substantive qualification rendering a class of potential candidates ineligible for ballot position" (emphasis in original). *U.S. Term Limits*, 514 U.S. at 835. But "a state amendment is unconstitutional when it has the likely effect of handicapping a class of candidates." *Id.* at 836.

Article XVIII's ballot labeling provisions do not qualify as politically neutral or evenhanded. The likely (and, we believe, the intended) effect of these ballot labels is to place a severe handicap on any candidate who does not support the term limits amendment specified in Article XVIII. Secretary of State Moore contends that these ballot labels are no different from ballot labels identifying a candidate's political party affiliation, and that they further the state's interest in providing voters with information regarding a candidate's position on term limits. But we see no reason why the requirement of political neutrality applicable in the ballot access context should not be applicable to any information that a state may choose to provide to voters through the content of the ballot. Information conveyed through the official state ballot necessarily enjoys the official imprimatur of the state, and we therefore believe that such information must be conveyed in a neutral, nondiscriminatory fashion.

In fact, it is precisely this official neutrality that distinguishes existing ballot labels (such as those identifying a candidate's political party affiliation or incumbent status) from the pejorative ballot labels at issue here. Article XVIII's ballot labels

-11-

effectively place the state's official stamp of disapproval on a specific group of candidates, namely, those whom the state disfavors because of their views on a single political issue or, in the case of incumbent candidates, because they failed to comply to the letter with Article XVIII's detailed list of instructions. We therefore conclude that Article XVIII's ballot labeling provisions constitute an improper exercise of Nebraska's authority to regulate the content of its ballots.

Proponents of a constitutional term limits amendment of course have a variety of means at their disposal for expressing their views and for publicizing candidates' positions on term limits. The function of the official election process, however, is " 'to winnow out and finally reject all but the chosen candidates,' ... not to provide a means of giving vent to 'short-range political goals.' " *Burdick*, 504 U.S. at 438, quoting *Storer v. Brown*, 415 U.S. 724, 735 (1974). Accordingly, we believe that the State may not "undermine the ballot's purpose by transforming it from a means of choosing candidates to a billboard for political advertising," *Timmons v. Twin Cities Area New Party*, 520 U.S. 351, 365 (1997). We therefore hold that Sections 2, 3, 4, and 5 of Article XVIII are an unconstitutional infringement on the right to vote.

IV.

Section 8 of Article XVIII states that if any portion of the article is held to be invalid, the remaining portions shall remain in full force and effect. We agree with the district court that Section 1 of the article, establishing as the "official position of the citizens and State of Nebraska" that its elected officials should enact a specific term limits amendment, is severable from the invalid portions of Article XVIII. Section 1, standing alone, is exactly the sort of advisory, nonbinding communication between the people and their representatives that is permissible, and we therefore conclude that it may remain in effect.

V.

U.S. Term Limits Foundation, which intervened as a defendant in this case, appeals from the district court's award of attorney's fees against it. The district court, in its order assessing attorney's fees under 42 U.S.C. § 1988(b), stated that the foundation had been "sufficiently active in the suit to be responsible for awardable fees and expenses," and assessed fees jointly and severally against it and Secretary of State Moore.

Under *Independent Federation of Flight Attendants v. Zipes*, 491 U.S. 754, 761 (1989), however, a court should assess attorney's fees "against losing intervenors only where the intervenors' action was frivolous, unreasonable, or without foundation." In apportioning attorney's fees between the losing parties, moreover, we think that the district court should have taken into account "the defendants' relative degrees of culpability and the time the plaintiffs were forced to spend litigating against the respective defendants," *Jenkins v. Missouri*, 838 F.2d 260, 266 (8th Cir. 1988), <u>cert. denied</u> <u>in</u> <u>pertinent</u> <u>part</u>, 488 U.S. 889 (1988); *see also Hendrickson v. Branstad*, 934 F.2d 158, 164 (8th Cir. 1991). We therefore remand this case to the district court for a reconsideration of its assessment of attorney's fees against U.S. Term Limits Foundation.

## VI.

In summary, we affirm the district court's judgment declaring invalid Sections 2, 3, 4, and 5 of Article XVIII of the Nebraska Constitution. We likewise affirm the district court's order permanently enjoining Secretary of State Moore from implementing those sections. We remand this case to the district court, however, for a reconsideration under *Zipes* of its assessment of attorney's fees against U.S. Term Limits Foundation.

BEAM, Circuit Judge, dissents with respect to Part III.

A true copy.

Attest:

CLERK, U.S. COURT OF APPEALS, EIGHTH CIRCUIT.