#26182-rev & rem-JKK

**2013 S.D. 7**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

\* \* \* \*

GREG YOUNG, AS SPECIAL
ADMINISTRATOR OF THE
ESTATE OF KATHY YOUNG,                    Plaintiff and Appellant,

                    v.

DR. JAMES H. OURY,                    Defendant and Appellee.

\* \* \* \*

APPEAL FROM THE CIRCUIT COURT OF
THE SEVENTH JUDICIAL CIRCUIT
PENNINGTON COUNTY, SOUTH DAKOTA

\* \* \* \*

THE HONORABLE JOHN J. DELANEY
Retired Circuit Judge

\* \* \* \*

RONALD A. PARSONS, JR.
STEVEN M. JOHNSON of
Johnson, Heidepriem & Abdallah, LLP
Sioux Falls, South Dakota

        and

G. VERNE GOODSELL
DAVID S. BARARI of
Goodsell Quinn, LLP
Rapid City, South Dakota                    Attorneys for plaintiff
                                            and appellant.


GREGORY J. BERNARD
LONNIE R. BRAUN of
Thomas, Braun, Bernard & Burke, LLP
Rapid City, South Dakota                    Attorneys for defendant
                                            and appellee.

\* \* \* \*

ARGUED ON OCTOBER 2, 2012
OPINION FILED **01/16/13**

#26182

KONENKAMP, Justice

[¶1.] In this medical malpractice case, the jury returned a verdict for defendant doctor. Plaintiff appeals, asserting circuit court error in improperly admitting evidence, precluding relevant evidence, refusing a jury instruction, and prejudicially commenting on the case in the presence of the jury.

## Background

[¶2.] While being treated for a cancerous tumor in her kidney in 2007, Kathy Young was diagnosed with a diseased aortic valve. She consulted Dr. K. John Heilman of the Heart Doctor's Clinic in Spearfish, South Dakota. Dr. Heilman recommended "catherization and valve replacement surgery," after she completed her cancer treatment. In January 2008, Kathy had her kidney removed, and in July was declared cancer free. She returned to Dr. Heilman to address her aortic stenosis. Dr. Heilman discussed with Kathy and her husband, Greg, the various types of valve replacement surgeries, specifically tissue versus mechanical. Ultimately, Dr. Heilman referred Kathy to Dr. James Oury in Rapid City.

[¶3.] On October 1, 2008, Kathy and Greg met with Dr. Oury, a cardiothoracic surgeon. Kathy told Dr. Oury that she wanted a valve replacement procedure that would allow her to live the longest, with the lowest chance of additional surgeries, and with the least amount of medical intervention. Dr. Oury discussed with Kathy a replacement option termed the Ross procedure. This procedure involves replacing an aortic valve with the patient's own healthy pulmonary valve and using a homograft to replace the patient's pulmonary valve. Technically more demanding, the Ross procedure, Dr. Oury thought, was the only

valve replacement method that would offer Kathy a chance of having this be the only cardiac operation she would need.

[¶4.] It would remain in dispute to what extent Dr. Oury explained the risks and benefits associated with the Ross procedure, as well as the risks and benefits of a mechanical or tissue valve replacement. Dr. Oury did not document what information he gave Kathy about the procedure, but testified that he discussed with her the risks and benefits. Greg recalled that Dr. Oury told him and Kathy that the Ross procedure had the lowest mortality rate and lasted an average of 25 years without a need for additional operations. Dr. Oury told them that the operation would take longer because he would be replacing two heart valves, instead of just one. Kathy chose the Ross procedure. The day before surgery, Kathy signed a document acknowledging that the risks included "severe loss of blood, infection, and/or heart stoppage," that the risk of death was 2-4%, and that there were risks of stroke, bleeding, abnormal rhythm, and a possible need for a pacemaker.

[¶5.] Kathy underwent surgery beginning at 7:30 a.m. on November 5, 2008, at Rapid City Regional Hospital. Dr. Oury made a video recording of the procedure. In the afternoon, a nurse told Greg that Kathy was experiencing bleeding problems and that Greg would be further apprised as matters progressed. Around 11:00 p.m., Dr. Oury told Greg that the bleeding problems were under control. But Kathy's heart stopped. Ultimately, she was placed on life support, and the next evening, she was removed from life support and died.

[¶6.] Several weeks after Kathy passed away, Dr. Oury met with Greg and his family. He told them that Kathy should not have died, that it was his fault and

responsibility, and that he carried insurance. In January 2010, Greg brought suit on behalf of Kathy's estate. He alleged that Dr. Oury was negligent in recommending the Ross procedure. In particular, he asserted that Dr. Oury failed to appropriately take into account that Kathy was 56 years old, had one kidney, and, in the days before the surgery, had increasing creatine levels. Greg also alleged that Dr. Oury failed to obtain Kathy's informed consent because he did not tell her that the Ross procedure is controversial, that no other hospital in South Dakota performs the procedure, that it is more commonly done on children, and that the intensive nature of the surgery could have stressed her remaining kidney.

[¶7.] At trial, Greg's expert, Dr. Carl Adam, testified that Dr. Oury was negligent when he deemed Kathy a suitable candidate for the Ross procedure. Dr. Adam told the jury about the information that should have been given to Kathy for her to make an informed decision to have the Ross procedure. Greg testified that Kathy did not in fact receive the necessary information, and thus he argued to the jury that Dr. Oury failed to obtain Kathy's informed consent.

[¶8.] Greg sought to introduce a civil complaint Dr. Oury brought against Rapid City Regional Hospital, in which he alleged wrongful termination and defamation. Greg wanted to use certain factual statements in that complaint to show that Dr. Oury was motivated to persuade Kathy into consenting to the Ross procedure. The court excluded the evidence. Greg was also prevented from presenting any evidence to the jury that the video made by Dr. Oury of Kathy's procedure had since gone missing or been destroyed. It is undisputed that the video no longer exists. The court deemed the evidence inadmissible and refused to

instruct the jury on spoliation of evidence because Greg's suit against Dr. Oury related not to any negligence during the operation, but to his decision to perform the Ross procedure and his failure to obtain Kathy's informed consent.

[¶9.] Dr. Oury presented expert testimony from Dr. Paul Stelzer that Kathy's age, one-kidney status, and creatine levels were not reasons alone to disqualify her as a candidate. Dr. Oury testified that he discussed the risks of the Ross procedure with Kathy and the fact that she had only one kidney. In Dr. Oury's view, Kathy's age, creatine levels, and one-kidney status did not make her ineligible for the procedure. Dr. Oury further testified that Kathy came to him wanting a procedure that would not require her to be on medication or have future cardiac surgeries. A mechanical valve replacement would have required her to be on Coumadin, and a tissue replacement had a shorter longevity.

[¶10.] To assist in describing to the jury the information he gave to Kathy, Dr. Oury displayed a chart that graphically indicated the patient survival rates of the various valve replacement surgeries. He said this chart was the "type" of information that he would give to a patient. Greg objected because the chart had not been disclosed before trial and because Dr. Oury gave no foundation for the information in the chart. The court initially overruled Greg's objection, but later deemed inadmissible the chart and related testimony. The court instructed the jury to disregard the testimony.

[¶11.] The jury returned a verdict in favor of Dr. Oury. Greg moved for a new trial asserting that multiple prejudicial errors prevented him from having a fair trial. He argued that the circuit court's erroneous admission of Dr. Oury's chart

and testimony allowed the jury to hear unsupported and surprise evidence directly related to the issue of informed consent. And though the court ultimately told the jury to disregard Dr. Oury's testimony related to the chart, the court's admonition could not "unring the bell." Greg argued that the circuit court erred when it refused to admit evidence about Dr. Oury's lawsuit against Rapid City Regional Hospital. He claimed his instruction on spoliation of evidence was relevant and proper because Dr. Oury lost or destroyed the video in anticipation of this lawsuit, and, therefore, the jury could infer that the video would have revealed that Kathy was not a suitable candidate for the Ross procedure. He also sought a new trial because the court made improper interjections and extraneous comments in the presence of the jury. Greg's motion was deemed denied by operation of law, and he appeals asserting the same issues.[1]

### 1. Admission of Chart and Related Testimony

[¶12.]     During Dr. Oury's direct examination, counsel asked Dr. Oury whether he gave information to Kathy about "the expected life of various valves." Dr. Oury answered affirmatively, and counsel displayed a chart to the jury. He asked Dr. Oury if the chart represented the "type" of information that would have been

---

1.     Standard of Review: A denial of a new trial is reviewed for an abuse of discretion. *SDDS, Inc. v. State*, 2002 S.D. 90, ¶ 17, 650 N.W.2d 1, 8. An abuse of discretion "is a fundamental error of judgment, a choice outside the range of permissible choices, a decision, which, on full consideration, is arbitrary or unreasonable." *Stavig v. Stavig*, 2009 S.D. 89, ¶ 13, 774 N.W.2d 454, 458 (citation omitted). "[A] new trial may follow only where the violation has prejudiced the party or denied him a fair trial. Prejudicial error is error which in all probability produced some effect upon the jury's verdict and is harmful to the substantial rights of the party assigning it." *Kjerstad v. Ravellette Publications, Inc.*, 517 N.W.2d 419, 426 (S.D. 1994).

provided to Kathy. Dr. Oury responded, "That is the type of information." Counsel requested admission of the chart for "illustrative purposes." Greg's attorney objected, saying, "Your Honor, it's a violation of the rule. It's a summary and we were not given any underlying data which the rule requires." The court denied the objection and allowed admission of the chart for illustrative purposes. Shortly thereafter, Greg's counsel again interjected,

> Your Honor, before we go any further, an additional objection is this document was not provided to the plaintiffs and that it's not – so there is no foundation for it, as well — provided to the client is what I was saying.
>
> Court: At this point of the game I am not in a position to resolve discovery disputes as far as I know. And at this point in time you lay a foundation to explain the data and — before you go any further with it. Where it came from.

[¶13.] Dr. Oury testified extensively about the chart. It was entitled, "Patient Survival Comparison (%)." It did not depict the life expectancy of the various *valves*, but rather the life expectancy of the *patients* who underwent the various replacement procedures. Dr. Oury prepared the chart, not for trial, but as part of his research for a past presentation on the Ross procedure. The chart had four lines, each one representing a different procedure. The line for the Ross procedure was at a constant level, suggesting a lengthy life expectancy, while the other three lines dropped off significantly. Thus, the Ross procedure was portrayed as affording a far greater survival rate for patients receiving it. There were no numbers on the chart in reference to the lines. The chart was displayed for the jury on a screen, and Dr. Oury stood in front of the display directing the jury to the chart with a laser pointer. He told the jury that the chart would inform a patient on the

available choices and give the patient "a comprehensive feeling for, so we use one of these valves. How long do they last. . . . And gives you an idea of what — how long do these valves last. I mean, it's a question we've talked about again and again over the last two days."

[¶14.] After Dr. Oury finished testifying, the court released the jury for lunch and addressed Greg's additional objection and motion to exclude the chart and Dr. Oury's related testimony. Greg argued that it was prejudicial to allow Dr. Oury to testify about this chart when it was not presented to Kathy, and also that Dr. Oury failed to establish the requisite foundation to use the chart for illustrative purposes. The court explained that it found "nothing of value" in the chart, that it lacked the necessary foundation, and was vague. After lunch, when the court reconvened, it gave the jury the following instruction:

> Over the course of the noon hour I have had the opportunity to reconsider the question of the testimony relative to the chart concerning the various valve replacements. And I have decided that it was — there is insufficient foundation for it to be admitted into evidence, and you should disregard only the testimony related to that particular chart in that portion of Dr. Oury's testimony. Thank you.

[¶15.] Greg argues that despite the court's admonition, "the admission of this evidence and the jury's exposure to it affected [Greg's] substantial rights and denied him a fair trial." Specifically, Greg asserts that prejudice resulted because, first, Dr. Oury failed to timely disclose the exhibit before trial, and, second, the court's after-the-fact exclusion of the evidence did not remove the prejudicial impression from the jurors' minds that Kathy and Greg were shown a chart that depicted the survival rates related to the various valve procedures, when in fact no such chart was presented to them.

[¶16.]     In response, Dr. Oury asserts that Greg did not object to the exhibit soon enough and when he did object, the grounds asserted related to foundation and not any discovery violation or timeliness. Dr. Oury further argues that the court cured any error when it excluded the evidence, instructed the jury to disregard the testimony, and gave the jury a final instruction at the end of the trial that it must disregard any testimony that the court struck from the record.

[¶17.]     Our review of Greg's objections reveals that Greg objected both to the lack of foundational support and Dr. Oury's failure to provide the exhibit to Greg. Indeed, in response to Greg's objection, the court indicated, "At this point of the game I am not in a position to resolve discovery disputes as far as I know." These objections were sufficient to preserve the issue for review.

[¶18.]     There is no dispute that the chart should not have been admitted into evidence and displayed to the jury. The question is whether the court's exclusion of the evidence after the fact and admonishment to the jury sufficiently cured any resulting prejudice. As a general rule, if a court excludes improperly admitted evidence and directs the jury to disregard it, the error is cured.[2] If, however, after

---

2.   *United States v. Wells*, 431 F.2d 432, 433 (6th Cir. 1970); *State v. McCarthy*, 104 N.W.2d 673, 677 (Minn. 1960) (citing *Jeddeloh v. Hockenhull*, 18 N.W.2d 582 (Minn 1945)); *State v. Vallejo*, 965 A.2d 1181, 1188-89 (N.J. 2009); *Verdicchio v. Ricca*, 843 A.2d 1042, 1064 (N.J. 2004); *Baddou v. Hall*, 2008 S.D. 90, ¶ 37, 756 N.W.2d 554, 563; *Gilliland v. Rhoads*, 539 P.2d 1221, 1225 (Wyo. 1975); *see also Bruton v. United States*, 391 U.S. 123, 134-35, 88 S. Ct. 1620, 1626-27, 20 L. Ed. 2d 476 (1968).

probing the record, it appears the prejudicial effect of the admission was not fully overcome, despite the curative instruction, a new trial is warranted.[3]

[¶19.] In deciding these questions, certain considerations are helpful: (1) to what extent did the evidence go directly to a critical issue, (2) is the evidence inherently prejudicial and of such a character that it would likely impress itself upon the minds of the jurors, (3) was the curative instruction firm, clear, and accomplished without delay, and (4) was there any misconduct on the part of the offering party? We address these questions individually.

*(a) To what extent did the evidence go directly to a critical issue?*

[¶20.] On the issue of informed consent, Greg testified that Dr. Oury failed to give them sufficient information about the intensive nature of the surgery involved in performing the Ross procedure, that it was a controversial procedure, and that it was contraindicated for Kathy, a 56 year old with one kidney. Dr. Oury testified that he discussed with Kathy the various risks and benefits associated with the Ross procedure, and though he did not make a written record of his discussions with the Youngs, he maintained that Kathy gave her informed consent. As support, Dr. Oury told the jury that the chart was the "type" of information he would have given the Youngs, leaving the impression that the Youngs saw a chart that compared the various procedures. Dr. Oury's testimony and chart undoubtedly went directly to the question whether Dr. Oury gave Kathy enough information to make an informed decision.

---

3. *Wells*, 431 F.2d at 433; *Brown v. United States*, 380 F.2d 477, 479 (10th Cir. 1967); *Ray v. Kapiolani Med. Specialists*, 259 P.3d 569, 585 (Hawaii 2011).

*(b) Was the evidence inherently prejudicial and of such a character that it would likely impress itself upon the minds of the jurors?*

[¶21.]     This factor deals with what the jury actually saw and heard and how much the jurors were expected to disregard. Dr. Oury's testimony using the chart covers seven pages of trial transcript. The exhibit remained on the projector screen for those seven pages and for two transcript pages thereafter. Dr. Oury stood outside the witness stand and used a laser pointer to draw attention to various parts of the chart. The chart depicted the Ross procedure as the only procedure with an almost constant life expectancy. The remaining procedures showed a considerable drop, but at some unknown point. The chart lacked numerical reference points for the jury. In fact, Dr. Oury acknowledged this and told the jury that they "would have to take [his] word for it that 50 percent is right about here." He emphasized that the chart "gives you an idea of what — how long do these valves last. I mean, it's a question we've talked about again and again over the last two days."

[¶22.]     Prejudice can be found in the use of this chart not only because there was no foundational support for the information the chart purported to show, but also because Dr. Oury was permitted to suggest to the jury that the Youngs were given equivalent information showing the survival rates of the various valve procedures and, therefore, were given information sufficient to make an informed decision. The prejudicial character of the exhibit and Dr. Oury's testimony would have made an impression on the minds of the jurors. Enlarged on a screen for the jury to see and without any foundational support, the chart gave the impression

that the Ross procedure was the prime choice compared to other procedures with sharply declining survival rates.

> *(c) Was the curative instruction firm, clear, and accomplished without delay?*

[¶23.]     The court's instruction came after Dr. Oury concluded direct and cross-examination and after the jury returned from its lunch recess.  The court had its first chance to exclude the evidence when counsel objected before the chart was displayed to the jury.  But the court made the rather cryptic ruling that it was not in a position to address the question.  Had the court addressed the substance of counsel's objection at that time, it would have learned that Greg had not received the exhibit until the day before trial and that there was no foundational support for the chart being used for illustrative purposes.

[¶24.]     Moreover, the court's instruction lacked clarity.  The court told the jurors that it reconsidered the admissibility of the chart, but then asked them to "disregard only the testimony related to that particular chart in that portion of Dr. Oury's testimony."  From this admonishment, the jury could have been left to believe it could still consider Dr. Oury's chart — the chart that depicted the Ross procedure as superior to the other procedures.  The lack of clarity and the fact that the court's instruction came after the jury heard considerable testimony about the exhibit and had the lunch hour to digest the material tends to negate the curative impact the court's admonishment might have had.  *See, e.g., State v. Winter*, 477 A.2d 323, 328 (N.J. 1984) (court immediately struck the comment, told the jury to disregard it, and asked the jury to acknowledge their ability to disregard it).

> *(d) Was there any misconduct on the part of the offering party?*

[¶25.] There was no evidence that the late disclosure of the chart was the product of misconduct.

[¶26.] "In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury." SDCL 19-9-5 (Rule 103(c)). Here, Greg objected before the jury ever saw the chart. He also objected before Dr. Oury stood with a laser pointer and emphasized the superiority of the Ross procedure. Dr. Oury was able to use the chart to enhance his position on the critical issue of informed consent and suggest that he gave the Youngs the same type of information the chart depicted. There being no clear, timely, and firm curative instruction, the evidence in all probability prejudicially influenced the jury in its decision, and the court abused its discretion when it denied Greg's motion for a new trial.

[¶27.] We address the following issues because they may arise in the new trial.

### 2. Dr. Oury's Lawsuit against Rapid City Regional Hospital

[¶28.] Greg argues that the court abused its discretion when it denied admission of any allegations Dr. Oury made in his lawsuit against Rapid City Regional Hospital. Greg asserted that the lawsuit was relevant because it provided evidence of a "pecuniary reason regarding why Dr. Oury might steer Kathy Young into having a surgical procedure for which she was not an appropriate candidate[.]" Dr. Oury, on the other hand, maintains that assertions in his complaint were allegations made *against* him by Rapid City Regional, which allegations he refuted

by bringing the lawsuit. He asks, "How can [his] refutation of allegedly defamatory statements — that he had low numbers and a high error rate — have any evidentiary value whatsoever?"

[¶29.]     We presume a court's evidentiary rulings are correct, and reverse only on a showing of an abuse of discretion. *Steineke v. Delzer*, 2011 S.D. 96, ¶ 7, 807 N.W.2d 629, 631. Relevant evidence is "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." SDCL 19-12-1 (Rule 401). There were no allegations in Dr. Oury's complaint that related to his selection of patients, motivation to increase volume, or failure to obtain informed consent. Dr. Oury did not contend in his complaint that he had external pressure on him, or that he performed the Ross procedure to advance his career. These were inferences Greg drew from a compilation of disconnected phrases in the complaint. Moreover, none of the factual allegations made by Dr. Oury in the complaint related to any conduct of the Youngs or of Dr. Oury in this action. The court did not abuse its discretion in excluding this evidence.

### 3. Spoliation of Evidence

[¶30.]     Before Kathy's surgery, she gave Dr. Oury permission to make a video recording of the procedure for teaching purposes. It is undisputed that the video recording was made, but has since been lost or destroyed. The court granted Dr. Oury's motion in limine to preclude Greg from eliciting testimony about the missing video recording. The court also refused Greg's requested jury instruction on spoliation of evidence, ruling that the instruction was unwarranted. Greg argues

that substantial evidence existed to support the inference that the recording "would have revealed exactly what occurred in the operating room and would have tended to prove or disprove that Kathy Young's death was related to her physical and medical unsuitability for the Ross procedure."

[¶31.] We review a court's decision to deny a requested jury instruction for an abuse of discretion. *Vetter v. Cam Wal Elec. Coop., Inc.*, 2006 S.D. 21, ¶ 10, 711 N.W.2d 612, 615. When an issue is supported by the evidence and an instruction correctly setting forth the law is requested, the court should so instruct the jury. *Kuper v. Lincoln-Union Elec. Co.*, 1996 S.D. 145, ¶ 32, 557 N.W.2d 748, 758 (citing *Bauman v. Auch*, 539 N.W.2d 320, 323 (S.D. 1995)). But a court is not required to instruct the jury on issues lacking evidentiary support. *Id.*

[¶32.] A spoliation instruction is warranted "when substantial evidence exists to support a conclusion that the evidence was in existence, that it was in the possession or under the control of the party against whom the inference may be drawn, that the evidence would have been admissible at trial, and that the party responsible for destroying the evidence did so intentionally and in bad faith." *State v. Engesser*, 2003 S.D. 47, ¶ 46, 661 N.W.2d 739, 755. What is missing here is a showing that the video would have been admissible at trial. Greg identifies nothing in particular that would have been on the video to support his claim that Dr. Oury negligently determined Kathy was an appropriate candidate for the Ross procedure or that Dr. Oury failed to obtain Kathy's informed consent. Greg does not contend that Dr. Oury was somehow negligent in the performance of the surgery. Greg's own expert witness, Dr. Adams, testified that the technical aspects of the operation

-14-

met the standard of care.  Giving a spoliation instruction would have encouraged jurors to speculate that simply because the video was missing something wrong was done during the surgery.  Not being warranted under the facts, the instruction was properly refused.

[¶33.]    Because we order a new trial, we need not address the remaining issue.

[¶34.]    Reversed and remanded for a new trial.

[¶35.]    GILBERTSON, Chief Justice, and ZINTER, SEVERSON, and WILBUR, Justices, concur.