#28188, #28208-a-SLZ
**2018 S.D. 42**

IN THE SUPREME COURT
OF THE
STATE OF SOUTH DAKOTA

* * * *

CENTER OF LIFE CHURCH,                          Plaintiff and Appellee,


v.


ROBERT NELSON and
DEBRA NELSON,                                   Defendants and Appellants.


* * * *

APPEAL FROM THE CIRCUIT COURT OF
THE SECOND JUDICIAL CIRCUIT
MINNEHAHA COUNTY, SOUTH DAKOTA

* * * *

THE HONORABLE MARK E. SALTER
Judge

* * * *

MITCHELL A. PETERSON of
Davenport, Evans, Hurwitz,
    & Smith, LLP                               Attorneys for plaintiff and
Sioux Falls, South Dakota                      appellee.

TIMOTHY A. CLAUSEN
RYLAND DEINERT of
Klass Law Firm, LLP                            Attorneys for defendants and
Sioux City, Iowa                               appellants.

* * * *

CONSIDERED ON BRIEFS
APRIL 16, 2018
OPINION FILED **05/30/18**

ZINTER, Justice

[¶1.]     Shortly after purchasing a house, the buyers experienced significant water-penetration issues.  The buyers subsequently sued the sellers for violating statutory-disclosure requirements.  The jury found in favor of the buyers, and both parties appeal.  The sellers argue the circuit court erred in denying their motions for judgment as a matter of law and for a new trial.  The buyers argue the court erred in denying their request for attorney fees.  We affirm.

## Facts and Procedural History

[¶2.]     In 1999, Robert and Debra Nelson purchased the single-family house that is at issue in this case.  It is a large 6,100 square foot structure that sits at the bottom of a hill.  It has a swimming pool and two separate basements: one located under the kitchen and one located under the garage.  The kitchen basement was finished and had several rooms.  The garage basement was unfinished, had a crawl space, and was primarily used for storage.  Water from the home's sump pumps, roof gutters, and drains in the backyard patio drained into four underground pipes that ran near the house and into the street.

[¶3.]     In 2003, Nelsons began experiencing water penetration in the kitchen basement.  They had a "LaCroix" dewatering system installed.  The installation involved drilling holes in the foundation to allow the water to run into a plastic gutter that ran inside the house to a sump pump.  The system did not prevent water penetration but instead redirected it.  According to Nelsons, they did not experience further water problems in the kitchen basement after installing the LaCroix system.

[¶4.]     In 2008, after deciding to build a new home, Mr. Nelson noticed a puddle of water in the garage basement. He had a "Blackburn" dewatering system installed in the garage basement. Installation of that system involved removal of part of the concrete floor to install tile, which collected and directed the water to a sump pump. Mr. Nelson testified he did not go into the garage basement very often, but he stated he did not notice any water-penetration issues in the garage basement after installing the Blackburn system.

[¶5.]     Nelsons moved out of the house in April or May 2009. Prior to putting it on the market, they painted most of the interior walls, replaced the hardwood floors, and installed several new appliances. In June 2009, they put the house on the market and filled out the seller's disclosure form required by SDCL 43-4-37 to -44. At the urging of their real estate agent, Jay Zea, Nelsons also had "HouseMaster" perform a home inspection and prepare a report.

[¶6.]     The inspection report noted that there were water marks and stains on the walls and floor and that one of the sump pumps was broken. It also noted that the grade around parts of the house sloped toward the foundation. Although the report noted the sloping landscaping, Zea wrote on the report: "Normal. No problem." Zea testified that he made this notation because Mr. Nelson told him it was not a problem.

[¶7.]     Section II of the disclosure form requires yes or no answers to questions concerning structural information. The form also requires that sellers who answer "Yes" to any of the questions are to "explain" in additional comments or on an attached separate sheet. The first question under Section II of Nelsons' form

asked: "Are you aware of any water penetration problems in the walls, windows, doors, basement, or crawl space?" Nelsons checked the box marked "Yes." After the question, Nelsons wrote, "Basement." The second question asked for the date and nature of any "water damage related repairs that were made." Nelsons wrote: "Basement dewatering system installed" in the "Last 5 years." The statement did not incorporate the home inspection report,[1] and no other information concerning water penetration issues was disclosed.

[¶8.]      Judy Shaw, a pastor at the Center of Life Church, expressed interest in the house after her friend and real estate agent, Marcie Raggow, recommended it. Shaw believed the house would be a good place to hold Church meetings and provide lodging for missionaries who were temporarily staying in the area. In August 2009, Shaw and members of the Church provided Nelsons with a brochure suggesting they donate the house to the Church for tax benefits. Nelsons declined.

[¶9.]      Shaw, Raggow, and other Church members walked through the house several times between August and November 2009. Shaw and Raggow also reviewed the disclosure form and HouseMaster report. No one noticed any signs of water, mold, or mildew problems.

[¶10.]      In November 2009, the Church made a formal offer at the full listing price ($658,000) if Nelsons would donate half of the purchase price back to the Church. The offer was not contingent on the Church's own inspection. Nelsons

---

1.      Copies of both the disclosure statement and the home inspection report were left inside the house for people who came to look at the house.

counteroffered for $595,000. The Church did not respond to the counteroffer and it expired.

[¶11.] In December 2009, Shaw approached Mr. Nelson to continue negotiations. The parties agreed on a price of $540,000 with no donation. A purchase agreement was executed that did not contain a contingency for the Church's own inspection. The formal closing took place in early January 2010.

[¶12.] About one week after closing, Sioux Falls experienced a January rainstorm, and Shaw observed a significant amount of mud and water flooding into the garage basement and crawl space. A week later, Shaw observed more water coming in from the walls in both basements. The Church continued to have water problems every time it rained. They also experienced leaking from the roof and gutters. When Mr. Nelson met with the Church at the house concerning these problems, he suggested they needed to remove snow from the backyard patio and the roof. The Church continued to experience significant water problems during subsequent summers and winters.

[¶13.] In the summer of 2011, the Church hired several contractors to look at the problem. One contractor used a "snake" camera to inspect the drain pipes that ran under the yard and driveway. He observed that the pipes were shattered. He believed that this was caused by inadequate sloping and ice jams that caused water to build up and freeze in the pipes.

[¶14.] The estimates to repair the home were large; and the Church sued Nelsons for violating the statutory disclosure requirements, fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation. At

trial, the Church called several witnesses, including three experts who opined that the dewatering systems installed by Nelsons were insufficient. They also testified it was likely that the problems experienced by the Church had been ongoing and could not have first appeared after the Church acquired the property. At the close of the evidence, Nelsons filed a motion for judgment as a matter of law. The circuit court reserved ruling on the motion and submitted the case to the jury.

[¶15.] The jury found in favor of Nelsons on the Church's claims of fraudulent misrepresentation, fraudulent concealment, and negligent misrepresentation. However, the jury found in favor of the Church on its statutory disclosures claim. The jury awarded $192,047.91 of the Church's $377,231.42 request for damages and repairs.

[¶16.] In post-trial proceedings, the circuit court denied Nelsons' motion for judgment as a matter of law. Nelsons then renewed the motion, arguing there was no evidence that they failed to truthfully complete the disclosure statement in good faith. The court denied the motion. Nelsons also moved for a new trial based on an objectionable statement of a Church witness, a violation of the court's sequestration order, and violations of an order prohibiting testimony regarding insurance. The court also denied that motion. Finally, the court denied the Church's motion for attorney fees.

[¶17.] Nelsons appeal, and we restate their issues as follows:

1. Whether the circuit court erred in denying Nelsons' renewed motion for judgment as a matter of law.

2. Whether the circuit court abused its discretion denying Nelsons' motion for new trial.

The Church raises the following issue by notice of review:

> 3. Whether the circuit court abused its discretion in denying the Church's request for attorney fees.

## Decision

*Renewed Motion for Judgment as a Matter of Law*

[¶18.]     Before addressing the merits of Nelsons' motions, we clarify our standard of review.  Nelsons cite to *Harmon v. Washburn*, 2008 S.D. 42, ¶ 10, 751 N.W.2d 297, 300, which used the abuse of discretion standard in reviewing a circuit court's rulings on motions for judgment as a matter of law and renewed motions for judgment as a matter of law under SDCL 15-6-50(a)-(b).  However, we recently departed from that standard in favor of de novo review.  *Magner v. Brinkman*, 2016 S.D. 50 ¶¶ 11-13, 883 N.W.2d 74, 80-81.  Ultimately, we apply the same standard as the circuit court: we view the evidence in the light most favorable to the verdict or to the nonmoving party.  *Id.* ¶ 14, 883 N.W.2d at 81.  Then, "[w]ithout weighing the evidence, the court must . . . decide if there is evidence that supports [the] verdict." *Id.*  "If sufficient evidence exists so that reasonable minds could differ, judgment as a matter of law is not appropriate." *Id.*  And because our review is de novo, we give no deference to the circuit court's decision.  *Steineke v. Delzer*, 2011 S.D. 96, ¶ 7, 807 N.W.2d 629, 631.

[¶19.]     The substantive law governing a seller's property disclosure statement is well-established.  "[W]ith the adoption of South Dakota's disclosure statutes[,] the doctrine of *caveat emptor* has been abandoned in favor of full and complete disclosure of defects of which the seller is aware." *Engelhart v. Kramer*, 1997 S.D. 124, ¶ 20, 570 N.W.2d 550, 554.  "The statutes require a *complete and truthful*

disclosure made in good faith, not a disclosure simply sufficient to put the buyer on notice of the defects." *Fuller v. Croston*, 2006 S.D. 110, ¶ 18, 725 N.W.2d 600, 606. A seller who intentionally or negligently fails to comply "is liable to the buyer for . . . the actual damages and repairs suffered by the buyer as a result of the violation or failure." SDCL 43-4-42. However, "a seller is not liable for a defect or other condition in the residential real property being transferred if the seller truthfully completes the disclosure statement." SDCL 43-4-40.

[¶20.] Nelsons argue they truthfully completed the disclosure statement and therefore cannot be liable. They point out they disclosed that they had experienced water penetration in the "Basement" and that they had installed a dewatering system in the "Last 5 years." But they do not support their "truthfully completed" argument with an analysis of the evidence at trial. Instead, they rely heavily on two statements made by the circuit court. Nelsons first point out that the court stated it did not believe there was evidence suggesting they were untruthful or acted in bad faith. Nelsons also point out that the circuit court denied the renewed motion for judgment as a matter of law partly because it stated Nelsons did not disclose the frequency or magnitude of the water penetration issues. Nelsons claim this reasoning impermissibly "expanded the requirements" of the disclosure statutes.

[¶21.] Nelsons' reliance on the circuit court's statements is misplaced. First, as previously noted, because our review is de novo, we give no deference to the circuit court analysis. Second, the circuit court was not "expanding the requirements" of the disclosure statutes; it was merely hypothesizing how the jury

-7-

could have reached its verdict based on the evidence. And in reviewing that matter, the frequency and magnitude of the water problems were relevant. The question was not simply whether Nelsons were truthful in reporting what they did disclose, the question was also whether their disclosure was complete; i.e. a "complete *and* truthful" disclosure made in good faith. *See Fuller*, 2006 S.D. 110, ¶ 18, 725 N.W.2d at 606.

[¶22.]     We explained the complete and truthful standard in *Engelhart*. We noted that the "terms 'truthful[]' and 'complete' do not operate independently to the exclusion of the other. A plain reading of the terms together evince[s] a more exacting standard than truth alone." *Engelhart*, 1997 S.D. 124, ¶ 11, 570 N.W.2d at 552-53. Therefore, even if Nelsons' disclosure statement was "truthful" in that it disclosed a water-penetration occurrence, the jury would be warranted in finding Nelsons liable if it also found that the statement was not "truthfully complete" because there were also ongoing issues that were not disclosed.

[¶23.]     The Church's theory was that Nelsons violated the disclosure statutes because they experienced ongoing water-penetration issues, they were aware of those ongoing issues, and they failed to disclose them. Nelsons disputed these factual claims. Mr. Nelson specifically testified that his answers on the disclosure statement were intended to represent that the problems had been fixed. Therefore, the dispute at trial and on appeal is a factual one. Did the Church introduce evidence indicating Nelsons were aware of ongoing water issues that were not disclosed? If so, the jury could have found that Nelsons' disclosure statement only

put the Church on notice of defects and was not a "complete and truthful" disclosure made in good faith. *See Fuller*, 2006 S.D. 110, ¶ 18, 725 N.W.2d at 606.

[¶24.]     Nelsons argue there was no evidence they were aware of ongoing issues. We disagree. We acknowledge there was no direct evidence of ongoing issues: none of the witnesses who testified observed any signs of ongoing problems prior to the sale. However, the Church produced both expert testimony and circumstantial evidence from which the jury could have found that Nelsons were aware of long-standing, ongoing issues.

[¶25.]     Jeremy Carlson, a landscaping contractor who assessed the house's landscaping and drainage, identified several pre-sale problems that were causing water to get into the home. Those problems included deteriorated brick, an exterior grade that sloped toward the foundation, and a drainage system that was inadequate to handle the amount of water coming into the system. He also indicated these problems would have originated long before the Church acquired the house. He testified that the collapsed drainage pipes would have frozen "within the first couple of years" and that many of the issues "started with initial construction." Thus, he opined that the problems would not have started like a "light switch"—the owner of this house could not "go from one year to having nothing and then all of a sudden one year you have really bad issues."

[¶26.]     Jason Kolb, another contractor, agreed. He testified that the drainage system was inadequate to handle any significant amount of water. He also testified that the water-penetration issues were due to the slope of the grade and ice jams.

He opined that water would have continued to penetrate the house after the dewatering systems were installed.

[¶27.] Pat McKnight, a masonry contractor, provided an additional consistent opinion. He testified that the slope of the backyard patio caused water to pool up and run into the house. He specifically opined that the water-penetration issues did not start with the January 2010 storm and that water problems would have continued after the dewatering systems were installed.

[¶28.] There was also circumstantial evidence suggesting Nelsons were aware of ongoing water problems. First, both McKnight and Kolb observed caulking around the foundation, which they believed was an attempt to prevent moisture from getting inside. Second, Shaw testified that on one occasion while viewing the house, Mr. Nelson made comments about having to remove snow from the back yard. Third, several witnesses observed that Nelsons had left several cans of water-, mold-, and mildew-resistant paint at the newly repainted house.

[¶29.] We finally note that there was evidence discrediting Nelsons' credibility concerning their awareness of ongoing problems. For example, Mr. Nelson's claim of no backyard-water pooling was not consistent with other evidence. The sloping patio was clearly a pre-sale condition, the jury heard testimony that the sloping patio and inadequate drainage was causing the pooling, and the jury saw a video of water pooling on the back patio after a rain storm. Additionally, Mr. Nelson made a statement to Shaw impliedly acknowledging that the garage basement floor might continue to get wet. Shaw testified that prior to purchasing the house, she told Mr. Nelson that she wanted to carpet the garage basement, but

Mr. Nelson suggested she should lay tile instead. Similarly, Mrs. Nelson's basis for knowledge of water problems was attacked. She testified that she would have noticed water problems if they were occurring because she was frequently in the kitchen basement doing laundry. But the Church pointed out that she failed to mention this in her deposition and that Nelsons had newer laundry facilities at other, more convenient places in the house.

[¶30.] Viewing the circumstantial evidence in a light most favorable to the verdict, and leaving it to the jury to judge credibility, there was sufficient evidence for the jury to find Nelsons were aware of ongoing water penetration issues that were not disclosed. Accordingly, there was sufficient evidence for the jury to find that Nelsons intentionally or negligently failed to truthfully complete the disclosure statement.[2] The circuit court did not err in denying Nelsons' renewed motion for judgment as a matter of law.

*Motion for New Trial*

[¶31.] Nelsons first argue they are entitled to a new trial because two Church witnesses mentioned insurance in their testimony.[3] Prior to trial, the court issued an order in limine prohibiting any reference to insurance. However, Raggow's

---

2. Nelsons contend that upholding the jury's verdict would impose a strict liability standard. *See Engelhart*, 1997 S.D. 124, ¶ 18, 570 N.W.2d at 554 ("We . . . hold that strict liability is not the requisite standard under South Dakota's disclosure statutes."). We disagree. The jury was correctly instructed that Nelsons could only be liable if the jury found that Nelsons intentionally or negligently failed to complete the disclosure statement. The evidence in the record supports such a finding.

3. We review the denial of a new trial under the abuse of discretion standard of review. *Casper Lodging, LLC v. Akers*, 2015 S.D. 80, ¶ 45, 871 N.W.2d 477, 492, *abrogated on other grounds by Magner*, 2016 S.D. 50, 883 N.W.2d 74.

-11-

testimony included a statement suggesting that HouseMaster had errors and omissions insurance for its inspection report. Additionally, Raggow and Shaw testified that Mr. Nelson had told Shaw to file a claim with the Church's insurance company. After the final mention of insurance, the court instructed the jury to disregard any reference to insurance.

[¶32.] Although Nelsons contend the references to insurance violated the court's order, they fail to demonstrate prejudice. The circuit court indicated that the purpose of its order "was to effectuate the purposes of Rule 411, which prohibits evidence of liability insurance for the purpose of establishing negligence or wrongdoing." *See* SDCL 19-19-411 ("Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully."). But here, the witnesses did not testify that Nelsons—the alleged wrongdoers—had insurance. The witnesses only referenced the Church's and HouseMaster's insurance. Nelsons have not demonstrated how those brief references to other parties' insurance suggested Nelsons acted negligently or wrongfully. They have also not demonstrated how the references to others insurance indicated that Nelsons had insurance to pay any damages awarded. Moreover, the circuit court gave a curative instruction. Generally, "if a court excludes improperly admitted evidence and directs the jury to disregard it, the error is cured." *Young v. Oury*, 2013 S.D. 7, ¶ 18, 827 N.W.2d 561, 567.

[¶33.] Nelsons next argue they were entitled to a new trial because a church witness both violated the court's sequestration order and also provided objectionable

testimony.[4] The record reflects that Mark Brooks, a member of the Church, entered the courtroom during Shaw's testimony in violation of the court's sequestration order. Nelsons also point out that Brooks made an objectionable statement that he believed a water-sealing primer known as "Kilz" was used by Nelsons in the basement. However, Nelsons have not shown that they were prejudiced by either occurrence. Brooks was in the courtroom for only approximately five minutes before being asked to leave, and he did not recall the subject of Shaw's testimony. This record does not suggest that Brooks's brief time in the courtroom gave him access to testimony that could have affected his subsequent testimony. Furthermore, the court sustained Nelsons' objection to Brooks's reference to Kilz and instructed the jury to disregard it. As previously noted, we presume the jury follows such instructions to disregard excluded evidence. *See id.*

*Attorney Fees*

[¶34.] The Church argues the circuit court erred in denying its request for attorney fees. "South Dakota utilizes the American rule that each party bears the burden of the party's own attorney fees." *In re S.D. Microsoft Antitrust Litig.*, 2005 S.D. 113, ¶ 29, 707 N.W.2d 85, 98. "Attorney fees may only be awarded by contract or when specifically authorized by statute." *W. Nat'l Mut. Ins. Co. v. TSP, Inc.*, 2017 S.D. 72, ¶ 21, 904 N.W.2d 52, 60. SDCL 43-4-42 authorizes fees in this type of case. It provides that "the court *may* award costs and attorney fees to the prevailing party." SDCL 43-4-42 (emphasis added). The Legislature's use of the

---

4.  "Whether a [new trial] should be granted where the court's sequestration order is violated is within the discretion of the trial court." *State v. Dixon*, 419 N.W.2d 699, 701 (S.D. 1988).

word "may" makes fee awards discretionary under this statute.[5] *See In re Groseth Int'l, Inc.*, 442 N.W.2d 229, 231 (S.D. 1989) ("Ordinarily, the word 'may' in a statute is given permissive or discretionary meaning. It is not obligatory or mandatory as is the word 'shall.'"); *Keller v. Keller*, 2003 S.D. 36, ¶ 18, 660 N.W.2d 619, 624 (concluding that the decision to award attorney fees under an analogous statute "is left to the sound discretion of the court"); *Berggren v. Schonebaum*, 2017 S.D. 89, ¶ 10, 905 N.W.2d 563, 565 ("Normally, an award of attorney fees is reviewed for an abuse of discretion.").

[¶35.]     The Church, however, contends that the circuit court's discretion under SDCL 43-4-42 extends only to the amount of fees that may be awarded rather than the decision to award them. Relying on several federal cases interpreting an attorney-fee provision in a civil rights statute (42 U.S.C. § 1988), the Church contends that "[a]bsent special circumstances, a prevailing party should be awarded . . . fees *as a matter of course.*" *See Hatfield v. Hayes*, 877 F.2d 717, 719 (8th Cir. 1989) (interpreting 42 U.S.C. § 1988 (1989)).

[¶36.]     The Church's reliance on attorney fee awards in federal civil rights cases is misplaced. The United States Supreme Court limited the discretion of federal district courts to deny plaintiffs' attorney fees under the civil rights statute for one significant reason. The Court did so because it was "necessary to carry out

---

5.     Compare SDCL 21-35-23 (requiring that attorney fees "shall" be allowed in certain condemnation proceedings); SDCL 15-17-51 (providing that reasonable attorney fees "shall" be awarded against a party filing certain frivolous or malicious claims); SDCL 15-6-37 (providing that the court "shall" award attorney fees in certain discovery matters unless specified conditions are found); SDCL 34-23A-22 (providing that the court "shall" render judgment for attorney fees in certain actions relating to abortion).

-14-

Congress' intention that individuals injured by racial discrimination act as "'private attorneys general,'" vindicating a policy that Congress considered of the highest priority.'" *Indep. Fed'n of Flight Attendants v. Zipes*, 491 U.S. 754, 759, 109 S. Ct. 2732, 2735, 105 L. Ed. 2d 639 (1989) (quoting *Newman v. Piggie Park Enter., Inc.*, 390 U.S. 400, 402, 88 S. Ct. 964, 966, 19 L. Ed. 2d 1263 (1968)). But when that congressional purpose is not present, the Supreme Court recognized that the presumption of awarding fees as a matter of course does not apply. *Christiansburg Garment Co. v. E.E.O.C.*, 434 U.S. 412, 418-19, 98 S. Ct. 694, 699, 54 L. Ed. 2d 648 (1978) (imposing more restrictive requirements on those who prevail in the defense of civil rights claims). Because there is no indication the Legislature intended South Dakota's disclosure statutes to incentivize "private attorney general" actions to vindicate inaccurate home disclosures, we decline to apply the federal civil-rights presumption here. Such a presumption would also be inappropriate because a 2009 amendment makes clear that even though the Legislature intended to encourage the disclosure of housing defects, it also intended attorney fees to be awarded to sellers who prevail in the defense of such claims. See 2009 S.D. Sess. Laws ch. 200, § 1 ("An act to allow sellers to receive attorney fees in actions involving the disclosure statement required for certain real estate transfers.").

[¶37.] A better analogy can be drawn from the Supreme Court's analysis of attorney fee awards under a more similar statutory scheme. *See generally Fogerty v. Fantasy, Inc.*, 510 U.S. 517, 114 S. Ct. 1023, 127 L. Ed. 2d 455 (1994). In that case, the fee dispute involved § 505 of the Copyright Act, which provides that a court "may . . . award a reasonable attorney's fee to the prevailing party" in cases

involving the improper use of another's copyright.  17 U.S.C. § 505.  The Supreme

Court noted that the statute's use of the word "may" granted discretion and that the

"automatic awarding of attorney's fees to the prevailing party would pretermit that

discretion." *Fogerty*, 510 U.S. at 533, 114 S. Ct. at 1033.  The Court concluded that

nothing in the text or purpose of the statute suggested that Congress intended

"[s]uch a bold departure from traditional practice." *Id.* at 534.

[¶38.]        The same is true with respect to SDCL 43-4-42.  The Legislature's use

of the word "may" clearly requires the use of discretion in awarding fees.  However,

the Church's request for a presumptive award of attorney fees is essentially an

argument that SDCL 43-4-42 requires application of the "British rule," which

awards attorney fees to the prevailing party as a matter of course.  *See Fogerty*,

510 U.S. at 533, 114 S. Ct. at 1033.  The Supreme Court rejected that argument in

*Fogerty*, and we must reject it here.  Requiring courts to award fees to the

prevailing party as a matter of course in home-disclosure cases would nullify the

Legislature's express grant of discretion.

[¶39.]        Because the decision to award fees is discretionary, we must decide

whether the circuit court abused its discretion in denying them to the Church, the

prevailing party.  The court acknowledged that Nelsons' disclosure was incomplete,

that the Church would be required to make substantial repairs, and that the

Church was the prevailing party.  However, the court also balanced a number of

competing factors in concluding "that the remedial purposes of SDCL § 43-4-42

would not be well-served by an award of attorneys' fees" in this case.  The court did

not believe that Nelsons necessarily acted intentionally—in fact, after listening to

the evidence, it believed that their position at trial was "fairly debatable." The Court also observed there was little evidence of reliance on the disclosure statement by the Church. Relatedly, the court observed that the Church did not request its own inspection even though both Raggow and Shaw were real estate agents and Raggow knew that homes in the area were susceptible to water penetration. Finally, the court believed that under the facts of this case, an award of fees would not serve a deterrent purpose. The court believed that Nelsons may not have understood this Court's technical, legal distinction between truthful and complete disclosures. The court ultimately observed that Nelsons' conduct "was not such a serious deviation from the statutory disclosure requirements to justify an award of attorneys' fees."

[¶40.] Other than arguing that it is entitled to fees simply because it prevailed, the Church does not dispute any of these equitable factors the circuit court considered in denying fees. Instead, it argues the court erred in failing to apply the factors for determining reasonable attorney fees identified in *Eagle Ridge Homeowners Ass'n v. Anderson*, 2013 S.D. 21, ¶ 28, 827 N.W.2d 859, 867. But the *Eagle Ridge* factors are inapplicable here. Those factors are useful in determining the reasonableness of the fee request (the amount)[6] rather than the appropriateness

---

6. The *Eagle Ridge* factors originate from Rule 1.5 of the South Dakota Rules of Professional Conduct. Rule 1.5 expressly provides that the factors are "to be considered in determining the reasonableness of the fee." SDCL ch. 16-18 app. Rule 1.5 (emphasis added). Those factors are:

> (1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

(continued . . .)

of making an award of any amount; and here, the dispute was not over the reasonableness of the amount the Church requested.

[¶41.]     In applying the abuse of discretion standard, we "do not determine whether we would have made the same decision as the circuit court." *Gartner v. Temple*, 2014 S.D. 74, ¶ 7, 855 N.W.2d 846, 850.  Instead, our function in reviewing matters that rest in the discretion of the circuit court "is to protect litigants from conclusions [that] exceed the bounds of reason." *Id.*  Here, in concluding that fees were not appropriate, the court carefully considered not only the verdict obtained by the prevailing party, but also the purposes of the disclosure statutes, Nelsons' culpability, and the Church's diligence.  Although we do not formally adopt these considerations, they are relevant factors in guiding a court's discretion.  We conclude that the circuit court's decision based on such factors was not a "fundamental error of judgment, a choice outside the range of permissible choices, [or] a decision, which, on full consideration, [was] arbitrary or unreasonable." *Gartner*, 2014 S.D. 74, ¶ 7, 855 N.W.2d at 850.

───────────────────────

(. . . continued)

> (2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
>
> (3) the fee customarily charged in the locality for similar legal services;
>
> (4) the amount involved and the results obtained;
>
> (5) the time limitations imposed by the client or by the circumstances;
>
> (6) the nature and length of the professional relationship with the client;
>
> (7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
>
> (8) whether the fee is fixed or contingent.

*Eagle Ridge*, 2013 S.D. 21, ¶ 28, 827 N.W.2d at 867.

**Conclusion**

[¶42.] The circuit court did not err in denying Nelsons' renewed motion for judgment as a matter of law. Further, the court did not abuse its discretion in denying the motion for new trial and declining to award attorney fees. Affirmed.

[¶43.] GILBERTSON, Chief Justice, and SEVERSON, KERN, and JENSEN, Justices, concur.